Argued April 24; affirmed September 25, 1945

LINN COUNTY *v.* ROZELLE, ET AL.

(162 P. (2d) 150)

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*William S. Risley,* of Albany (Marks & McMahan, of Albany, on the brief), for appellants.

*Mark V. Weatherford,* of Albany (Harlow L. Weinrick, District Attorney, of Albany, on the brief), for respondents.

ROSSMAN, J.

This is an appeal by the defendants from a decree of the circuit court which holds that the plaintiff is the owner of the northeast quarter of the northwest quarter of Section 29, Township 13 South of Range 1 East of Willamette Meridian, Linn County, Oregon, and enjoins the defendants (appellants) from interfering with that parcel of property.

The issue submitted by the appeal is the ownership of the above-described tract of land. The plaintiff's claim to title is based upon a foreclosure of a certificate of delinquency for taxes assessed against the property in 1922. The defendants (appellants) attack the validity of the foreclosure suit just mentioned and claim that title to the disputed property is vested in the defendant, Ada Rozell. According to them, Ada Rozell, or her predecessors in interest, gained title to the property through adverse possession. Only the defendant, Ada Rozell, makes claim to title.

The complaint avers: The taxes for the year 1922 assessed against the above-described tract were not paid; March 1, 1922, one A. A. White was the record owner of the tract; in 1928 a certificate of delinquency bearing No. 1708 was issued; later the plaintiff instituted a suit to foreclose the certificate; the publication of the summons was ordered by the court; the

summons was published for six successive weeks; February 4, 1929, the circuit court, after adjudging the defendants in the foreclosure suit, including White, in default, entered a decree of foreclosure; February 23, 1929, the sheriff, acting pursuant to the decree, offered the property for sale; later the sheriff sold the tract to the plaintiff; and still later the sheriff issued to the plaintiff a deed of conveyance which was recorded September 3, 1929. Omitting details, the above is the manner in which the plaintiff alleges it acquired title to the disputed parcel of property. The complaint avers that the defendants, in recent months, repeatedly and wilfully trespassed upon the property. Those averments are accompanied with others which state that the defendants destroyed fences erected by the plaintiff upon the property and took from the property "many truckloads of gravel, the exact number being unknown to plaintiff." After alleging that the defendants threaten to repeat their trespasses, the complaint charges:

> "Plaintiff's remedy at law is inadequate in that such remedy would necessitate a multiplicity of actions, each of which would involve expense and time and effort of the courts greatly out of proportion to the damage caused to and sustained by plaintiff by each of the separate acts which defendants threaten to commit against plaintiff's said property, and in that the damage caused by each of said acts would be trifling, but the total damage to plaintiff by the threatened repetition and continuing of such acts would be irreparable."

The prayer asks for an order adjudicating the plaintiff to be the owner of the property and enjoining the defendants from interfering with the plaintiff's ownership and possession.

The answer denies the averments of the complaint. It alleges that the defendant, Ada Rozelle, whose true surname is averred to be Rozell, "is the owner in fee simple of the property described in said complaint" with the exception of the part north of the center of the channel of the South Santiam river. None of the defendants makes any claim to the part which lies north of the river, but all four, as already indicated, claim that the defendant, Ada Rozell, is the owner of the part which lies south of the river. The answer avers:

> "Said defendant, Ada Rozelle, is now, and has been in the possession of said real property above described, and the whole thereof for more than twenty years last past; and that said defendant and her predecessors in interest have been in the actual, open, continuous, notorious, hostile, exclusive, and adverse possession of said real property, and the whole thereof, for more than seventy years last past under a claim of ownership in fee simple of said real property, and the whole thereof."

The remaining parts of the answer attack the validity of the plaintiff's title. They allege: The property in dispute, together with other lands aggregating in all 153 acres, was entered upon the assessment roll for the year 1922 as a single tract at a valuation of $2,000; in 1928 the sheriff segregated the tract into four parcels and in so doing attempted to apportion the taxes originally levied against the entire tract to the four parcels; one of the parcels which he created included the north half of the northwest quarter, a part of which is the land in dispute; later the sheriff attempted to make another segregation—this time he combined the southeast quarter of the southwest quarter with

the land in dispute, thus forming the tract covered by certificate of delinquency No. 1708; August 31, 1928, the sheriff issued the aforementioned certificate of delinquency No. 1708 to Linn County in the sum of $70.68; certificate No. 1708 covered both the northeast quarter of the northwest quarter (the tract in dispute) and the southeast quarter of the southwest quarter. Continuing, the answer avers:

"On the 4th day of February, 1929, a default and decree was entered in said proceeding declaring all the defendants therein to be in default and ordering said certificate of delinquency No. 1708 to be foreclosed and the real property therein described sold to satisfy such certificate of delinquency plus interest, penalties and costs of foreclosure."

The answer then says that after the entry of the foreclosure decree

"the sheriff of Linn County, Oregon, again made a division of the real property described in said certificate of delinquency and on the 20th day of February, 1929, allowed a redemption of the southeast quarter of the southwest quarter of said Section 29 for a sum of money arbitrarily determined by said sheriff."

According to further averments, the sheriff, on February 23, 1929, "made a pretended sale" of the tract in dispute for the sum of $39.06 to the county to satisfy the certificate of delinquency, and still later executed to the county a deed which described the property and which was recorded in the deed records September 3, 1929. The remaining allegations aver that Ada Rozell was not a defendant in the tax foreclosure proceeding; costs in the sum of $3.20 were added to the amount stated in the certificate, although no cost bill was filed; the property was worth $10,000 and therefore the sum

received by the sheriff ($39.06) "is greatly disproportionate to the true value"; and for the reasons above delineated the foreclosure decree is void. Finally, the answer tenders into court the sum of $70.68 "to be paid to plaintiff in case the right of title of claimant shall fail in this suit."

The reply, apart from admitting that the disputed tract was taxed, that in default of the payment of the tax the property was sold, and that later a deed was delivered to the county, denied all averments of the answer. It pleaded facts intended to show an estoppel and others indicating that the defendants permitted the short term statute of limitations to run before challenging the tax deed.

From the above review of the pleadings it is seen that the parties are agreed that the tract in dispute was subject to taxation; that it was taxed; that the tax was not paid; that a certificate of delinquency was issued; that a tax foreclosure suit was filed; that February 4, 1929, a default decree was entered by the circuit court which ordered the sale of the property to satisfy the delinquent tax, costs, interest and penalties; that a sale occurred; that a deed was delivered to the county; and that on September 3, 1929, the deed was recorded in the deed records. Thus it will be observed that the defendants do not claim that any one of them was the record owner of the property at any time and that none of them claims ignorance of the levy of the tax, of its nonpayment, of the issuance of the certificate of delinquency, or of any of the steps taken in the foreclosure of the certificate of delinquency. Likewise, the defendants do not aver that the tax foreclosure suit failed to properly describe the property.

To summarize: The attacks made by the answer upon the county's title are the following: Although the property involved in this suit was entered upon the assessment rolls with other tracts aggregating in all 153 acres, and the value of all the tracts was fixed at a gross sum, the sheriff of Linn County—not the assessor—three times made segregations of the assessed unit; the defendant, Ada Rozell, was not named as a defendant in the tax foreclosure suit; costs in the amount of $3.20 were added to the amount stated in the certificate of delinquency although no cost bill was filed; the sum of $39.06 received by the sheriff for the property is grossly disproportionate to the sum of $10,000, which the answer says is the value of the property; A. A. White, the person in whose name the land was assessed, and who was the individual named as defendant in the tax foreclosure suit, had no interest in the property.

Although the answer tenders only the issues aforementioned, the appellants' brief states as an additional attack upon the county's deed a purported failure to mail a copy of the summons published in the tax foreclosure suit to the aforementioned A. A. White, defendant in that suit.

Our statutes which regulate the foreclosure of tax liens had their inception with 1907 General Laws of Oregon, chapter 267, which was virtually a duplicate of laws of the State of Washington upon the same subject. In *Hoskins v. Dwight,* 69 Or. 558, 139 P. 922, the decision, after acknowledging that our 1907 act was "patterned after the laws of the state of Washington," restated the familiar rule:

"When the statute of another state has been incorporated in the laws of Oregon, the interpre-

tation placed upon the enactment by the court of last resort of the state from which the law was taken and made before its adoption in this state governs the construction to be placed upon it in Oregon.''

See also *Elliott v. Clement,* (Or.), 149 P. (2d) 985, and *Getschell v. Walker,* 129 Or. 602, 278 P. 93.

Prior to the adoption of the 1907 act no judicial proceeding preceded the sale of tax delinquent property. The sale was made by a ministerial officer of the county whose authority for making the sale was a warrant issued by the county clerk. The owner of the property supposedly delinquent was afforded no hearing of any kind, unless he himself instituted a suit in which he attacked the legality of the tax deed. Under those circumstances, tax sales brought prices wholly out of proportion to the value of the property, and tax deeds were everywhere regarded with disfavor. *Smith v. Dwight,* 80 Or. 1, 148 P. 477, 156 P. 573, Ann. Cas. 1918D 563. Then came the 1907 act. Under that act, according to the decision last cited, ''the proceedings, especially upon a sale, were radically changed from what they had theretofore been.''

The 1907 act revolutionized the procedure whereby tax delinquent property was sold to satisfy its tax indebtedness. It introduced into the process a judicial determination concerning the tax and its delinquency. It prohibited the county from selling property purportedly tax delinquent without first instituting a suit in the circuit court and securing a decree which determined the amount of the tax, found that it was delinquent and ordered the sale of the property. This new legislation required that the person entered upon the tax roll as owner of the property should be made a defendant in the tax foreclosure suit and accorded

him and all others interested in the property an opportunity to present to the circuit court every defense which they possessed against the county's suit and to secure an adjudication thereof. Only in the event that the court found there was no defense to the suit which possessed merit could it authorize the sale of the property. The 1907 act discarded the warrant signed by the county clerk which previously had been the sheriff's authority for selling property supposedly tax delinquent and substituted for it an order signed by the circuit court after the entry of a foreclosure decree. The 1907 act has been amended in the succeeding years, but the fundamental thesis that a tax lien should be foreclosed in substantially the same manner as a mortgage or a mechanic's lien has not been impaired; to the contrary, it has been strengthened. The amendments make even more clear the purpose to afford the owner of property, delinquent according to the tax collector's records, his day in court before a decree is issued for the sale of the property. An instance showing the operation of the new procedure is *Clatsop County v. Taylor,* 167 Or. 563, 119 P. (2d) 285, which was an appeal from a tax foreclosure decree.

The legislation of 1907, in brief, provided that six months after taxes charged against real property became delinquent, the tax collector should issue a certificate of delinquency against the property to anyone who paid the delinquent taxes. The certificate of delinquency could not be foreclosed until three years had transpired from the first date of delinquency. In the meantime, the certificate bore interest and was somewhat akin to a mortgage or a mechanic's lien. If three years passed and no certificate of delinquency was issued to anyone, the tax collector was required to

issue a certificate of delinquency to the county. Thereupon the county could foreclose, in an omnibus suit, all of the certificates of delinquency which it possessed. The summons, in the event the county was the plaintiff, was served by publication. Before any decree could be entered, the county was required to file an application for judgment and decree. At that point anyone interested in the property could file a cause of objection. The circuit court was thereupon required to try the issue and pronounce judgment "as the right of the case may be * * * to secure substantial justice to the contestants." Subsequent amendments, as already stated, have preserved these features and have clarified and strengthened them.

The act of 1907 and all amendments that have been made to it have treated the property as the debtor. The owner and his name are merely items that identify the property. The tax foreclosure procedure dispenses with pleadings bearing the name of Complaint, Answer and Reply, but does not dispense with such papers and the formulation of issues. The summons and the application for judgment are the pleadings on behalf of the county. Anyone who possesses an interest in the property may submit a Cause of Objection. Liberality of amendment is expressly permitted. When all of the pleadings have been filed, an issue has been created which, as already indicated, calls for judicial determination. The court is invested with full power to determine the issues and its adjudication assumes the form of a decree and judgment.

Although the proceeding may be of the omnibus type, the judgment and decree is "a several judgment against and lien upon each tract or lot, or part of a tract or lot, for each kind of tax or assessment in-

cluded therein.'' Following the entry of the decree, in the event it is favorable to the county, the sheriff is directed to sell the property. Before making the sale he is required to post notice for ten days. Up to the time of the execution of the deed the owner of the property may redeem it by paying the sums due. Thus, ample time and opportunity are afforded the delinquent taxpayer to meet his obligation and retain his property.

The Washington act, upon which ours was patterned, won from the Federal Supreme Court the following encomium in *Ontario Land Co. v. Wilfong*, 223 U. S. 543, 56 L. Ed. 544, 32 S. Ct. 328:

"As remarked by Judge Gilbert, speaking for the Court of Appeals: 'The revenue and taxation law of Washington is exceptionally lenient to the delinquent taxpayer, and offers him unusual protection in providing that his property may not be sold for delinquent taxes except upon foreclosure proceedings and after a long period of delinquency; three years in the case of foreclosure by an individual certificate holder . . . and five years in the case of foreclosure by the county.' In both cases there is public notice given and proceedings in court, time and opportunity enough, we think, even to an accidental or negligent omission to pay taxes, and more than enough to the calculated and culpable delinquency charged against appellants in this case.

"The courts of the State have refused to consider as essential to the proceedings in court to foreclose the lien for the taxes the omission of some merely ministerial duty of an officer which in no way could affect the rights of the property owner. Miller v. Henderson, supra, and Smith v. Newell, 32 Washington, 369.

\*     \*     \*     \*     \*

"These grounds of objection are untenable. The laws of Washington are as clear as they are simple in their requirements. They do not require a complaint to be filed before the publication of summons, but provide for an application for judgment after the publication of summons, and the court is explicitly directed to examine the application and to 'hear and determine the matter without other pleading.' There is a careful avoidance of complexity and expense. The property is proceeded against, and the procedure is made simple."

We shall now consider the appellant's contention that the tax foreclosure suit was not a proceeding in rem, but one quasi in rem, and that, therefore, the appellant, Ada Rozell, should have been made a defendant in the proceeding.

The subject-matter of the tax foreclosure suit was not a claim against Ada Rozell or anyone else, but a tax which had been assessed against the property described in the tax foreclosure suit summons. The ultimate purpose of the suit, in the event the tax was not paid prior to the sale of the property, was to establish title in the plaintiff to the property against all the world. Thus, the purpose was not to adjudicate a controversy between the plaintiff and some other party, but to establish the plaintiff's right to the property. The specific delinquent owner of the property was a matter of no concern to the plaintiff—it had neither a claim against him nor a quarrel with him.

■■ Proceedings are in rem when they are directly against the property and terminate in an adjudication against all mankind equally binding upon everyone. They are quasi in rem when, although they deal with specific property, they adjudicate a controversy between the particular parties to the proceeding. *Free-*

*man v. Alderson,* 119 U. S. 185, 30 L. Ed. 372, 7 S. Ct. 165, and 1 Am. Jur., Actions, §§ 45 and 46.

As we have already said, our statutes governing the foreclosure of certificates of delinquency by a county deem the property as the debtor. General Laws of Oregon, 1927, chapter 214, which was in effect when the tax foreclosure suit under consideration was filed, said that the suit ''shall be and be deemed and considered a proceeding *in rem* against the property itself.'' Our decisions, obedient to that provision, have interpreted the proceeding as in rem. *Elliott v. Clement,* supra, *Clatsop County v. Taylor,* 167 Or. 563, 119 P. (2d) 285, and *Rae v. Morgan, et al.,* 125 Or. 644, 266 P. 1069, 267 P. 1072. The federal courts have likewise construed it. *Coy v. Title Guarantee & Trust Co.,* 257 Fed. 571. The Supreme Court of Washington, in construing language similar to that of our act, has repeatedly pronounced the proceeding as in rem. The instances are so numerous that we shall refer only to *Sparks v. Standard Lumber Co.,* 92 Wash. 584, 159 P. 812, wherein the court said:

> ''The legislature has for twenty-five years, by the clearest expressions, made a tax foreclosure a proceeding *in rem,* and a tax title a favored title as contradistinguished from the ordinary conception of a tax title—a title tainted with the suspicion of illegitimacy. * * * So that, with the passing of the old rule, it may fairly be said that a tax title is no longer *nullius filius,* but is equivalent to a decree quieting the title in the purchaser as a grant from the sovereign state.''

*Ontario Land Co. v. Yordy,* 212 U. S. 152, 53 L. Ed. 449, 29 S. Ct. 278, held:

> ''In Washington proceedings for collection of taxes upon real property are *in rem.*''

■ We are satisfied that the tax foreclosure suit was a proceeding in rem, but, before passing on to the next contention, will pause to determine whether the aforementioned A. A. White, and not Ada Rozell, was properly made the party-defendant in that suit.

■ In the tax foreclosure proceeding Linn County, our present plaintiff, was the party-plaintiff and the suit was of the omnibus type permitted by General Laws of Oregon, 1927, chapter 214. Two of three scores of items of property and their owners were named in the proceeding. The statute just mentioned was in effect at the time the tax foreclosure suit was filed and specified in the following words the persons who should be named in the summons:

"The name of the person or persons appearing on the latest tax roll in the hands of the sheriff for collection at the date of the first publication of such summons or notice as the owner or owners of said property shall, for the purpose of this section and all foreclosures by counties, be considered and treated as the owner or owners of said property and said proceedings in rem against the property itself * * * and all persons owning or claiming to own or having or claiming to have an interest therein are hereby required to take notice of said proceedings, and any and all steps thereunder."

A tax roll of Linn County was introduced in evidence. It was "the latest tax roll in the hands of the sheriff for collection at the date of the first publication of such summons" in the tax suit. An entry upon it identified A. A. White as owner of the disputed tract. The title instruments before us also show that White was the record owner of the property at the time the tax suit was filed. The name Rozell had never appeared in any title instrument which concerned the disputed tract, and no tax concerning the latter was ever levied

by any instrument mentioning the name Rozell. The appellants concede that they never paid any tax assessed against the disputed tract, but contend that they were in possession of the property and that, therefore, they should have been given actual notice of the institution of the tax foreclosure suit. In disposing of a similar contention adverse to a party who likewise claimed title by adverse possession, the Washington court, in *Rowland v. Eskeland,* 40 Wash. 253, 82 P. 599, said:

> "While the allegation of adverse possession, etc., may be sufficient to show that the appellants were the actual owners of the lands by reason of such possession, it does not follow that the property was not assessed to the owners of the record title against whom the appellants were maintaining ownership by adverse possession. * * * If appellants desired to contest the collection of the taxes, because of matters set out in their second and third defenses, they were required to do so in the foreclosure action. These questions cannot be tried in this collateral proceeding, under the statute above cited."

See to similar effect *Rae v. Morgan,* supra.

We are satisfied that the summons properly named A. A. White as owner and as party-defendant. *Elliott v. Clement,* supra; *Gordon v. Adams,* 125 Or. 662, 268 P. 60; *Guthrie v. Haun,* 159 Or. 50, 76 P. (2d) 292.

The contention that the county's deed is void because a copy of the published summons was not mailed to the aforementioned A. A. White is based upon General Laws of Oregon, 1927, chapter 355, which *Watson v. Jantzer,* 151 Or. 1, 47 P. (2d) 239, held was repealed by implication by General Laws of Oregon, 1929, chapter 150, and which was expressly repealed by 1937 Oregon Laws, chapter 470, § 7.

The 1927 legislature enacted two measures pertaining to the foreclosure of certificates of delinquency, chapters 214 and 355. The former amended § 4351, Oregon Laws, as amended by chapter 276, § 1, General Laws of Oregon, 1923. Section 4351, just cited, regulated the foreclosure by counties of certificates of delinquency held by them. Apart from amendments made by the 1913, 1917 and 1919 legislative sessions, § 4351 was a part of the 1907 statute. Chapter 214 read:

"* * * provided, that for the purpose of this section and in all foreclosures by a county summons may be served or notice given exclusively by publication in one general notice * * *. Such summons or notice shall be published once a week for six consecutive weeks, and it shall not be necessary to mail any copy of such summons or application to any defendant named or any person interested in any of the property described therein in any such county foreclosure. * * * and the proceedings on the part of the county to foreclose the liens against said property may be brought in one action, and all persons interested in any of the property involved in said proceedings may be made codefendants in said action, and if unknown may be therein named as unknown owners, and the publication of such notice shall be sufficient service thereof on all persons interested in the property described therein. * * * and said proceedings shall be and be deemed and considered a proceeding in rem against the property itself; * * * and all persons owning or claiming to own or having or claiming to have an interest therein are hereby required to take notice of said proceedings, and of any and all steps thereunder. * * *."

Unlike chapter 214, which we have just seen was a part of our general laws pertaining to and regulating the foreclosure of certificates of delinquency, chapter 355, the other 1927 enactment concerning certificates

of delinquency, did not purport to amend any law. It read:

> "The sheriff of the county, within ten days after the first publication of summons in suits to foreclose tax certificates of delinquency by the county, shall forward by mail to such owner of any of the property upon which foreclosure is begun a copy of the published summons at the last known address of such owner, as shown by the latest assessment roll, or other records in the tax collector's office showing such party's name, and if such address is not shown by any of such records and is unknown, then to such owner at the county seat, and said sheriff shall make and file in said cause his return of mailing such summons."

We have already taken note of the fact that the statute just quoted was repealed two years after it was written. It was, however, in effect when the tax foreclosure suit was filed.

Chapters 214 and 355 were approved by the governor and filed in the office of the secretary of state upon the same day, March 3, 1927. Although the answer does not aver, and the evidence does not disclose, whether or not the duty exacted by chapter 355 was performed, counsel for the respondent frankly conceded that it was neglected.

The appellants' brief twice refers to White, being the person to whom a copy of the published summons should have been mailed, as "a stranger to the title." At another place their brief says:

> "At the time taxes were assessed, and at the date of the pretended sale of the land * * * A. A. White, the person in whose name said land was assessed and such pretended sale made, had no title to the lands. * * * and no title whatever in A. A. White at any time."

Since such are the appellants' concessions, and especially since White is not a party to this suit, it is manifest that the sheriff's failure to comply with chapter 355 did not prejudice the appellants, unless the failure denied the court jurisdiction over the tax foreclosure suit.

Normally, statutes which require personal service, in addition to the publication of the summons, are construed as jurisdictional and when thus construed it is generally held that a failure to meet the statutory requirement is fatal to the service and the judgment. *Moore Realty Co. v. Carr,* 61 Or. 34, 120 P. 742; *Knapp v. Wallace,* 50 Or. 348, 92 P. 1054, 126 Am. St. Rep. 742; *Odell v. Campbell,* 9 Or. 298. The question then occurs as to whether or not the legislature in enacting chapter 355 intended that a compliance with its terms was essential to the jurisdiction of the court over the suit.

As will be seen by reverting to our quotation from the pertinent provisions of chapter 214, it says:

"It shall not be necessary to mail any copy of such summons or application to any defendant * * * and the publication of such notice shall be sufficient service thereof on all persons interested in the property described therein. * * * and said proceedings shall be and be deemed and considered a proceeding in rem against the property itself; * * * and all persons owning or claiming to own or having or claiming to have an interest therein are hereby required to take notice of said proceedings, and of any and all steps thereunder * * *."

Thus, the plain language of chapter 214 makes it clear that the publication of the summons is the jurisdictional fact, for it says:

"The publication of such notice shall be sufficient service thereof on all persons interested in the property described therein. * * * It shall not be

necessary to mail any copy of such summons or application to any defendant * * * all persons owning or claiming to own or having or claiming to have an interest therein are hereby required to take notice of said proceedings, and of any and all steps thereunder.''

Thus it is seen that chapter 214 expressly said that the duty exacted by chapter 355 (the mailing of the summons to the owner) was not necessary to give the court jurisdiction to proceed. The question remains, what was the purpose of the legislature in enacting chapter 355.

From *Winslow v. Fleischner,* 112 Or. 23, 228 P. 101, 34 A. L. R. 826, we quote:

''The same legislature which enacted said Chapter 66, Laws of 1921, also enacted Chapter 153, Laws of 1921, relating to the subject matter of preserving and protecting game animals and fish. These two statutes must be construed together: 2 Lewis' Sutherland on Statutory Construction (2 ed.), 844, 845, § 443; 25 R. C. L. 1062; Stoppenback v. Multnomah County, 71 Or. 493, 509 (142 Pac. 832), and cases therein cited.

'' 'It is to be observed that in the comparison of different statutes passed at the same session or nearly at the same time this circumstance has weight; for it is usually referred to as indicating the prevalence of the same legislative purpose, as rendering it unlikely that any marked contrariety was intended. But whether the prior statute is recent or of long standing it must yield if there is a conflict.' 2 Lewis' Sutherland on Statutory Construction (2 ed.), 845, §§ 443-448.''

We now quote from 50 Am. Jur., Statutes, § 351:

''Because of the fact that the situation presents the same men acting on the same subject, and of the presumption that the acts were imbued with the same spirit and actuated by the same policy, the rule that statutes in pari materia should be con-

strued together applies with particular force to statutes which are enacted at the same time, or about the same time. This rule is especially applicable if the two acts are passed or approved on the same day."

■ When construed in *pari materia,* it seems clear that no part of either of the two statutes should be deemed a repeal of any part of the other. We believe that chapter 214 should be construed as a delineation of the steps that the legislature required to be taken in order that the court have jurisdiction over the cause, parties and subject-matter. Chapter 355, according to our belief, was prompted by a purpose to provide the owner with a copy of the published summons for substantially the same reasons that a defendant in a criminal action is given a copy of the indictment at the time of the arraignment. The requirement is directory only, and a failure to meet its demands is not fatal to the jurisdiction. We, therefore, conclude that the sheriff's failure to mail a copy of the published summons to White did not deny to the court jurisdiction.

The above disposes of every contention which in any view of the situation could have had a bearing upon the court's jurisdiction over the tax foreclosure suit. We are satisfied that the court had jurisdiction. We are likewise satisfied that the contentions above reviewed are without merit.

We shall now consider the issues based upon the defendants' averment that it was the sheriff who made the segregation of the property described in the assessment roll, and that it was also the sheriff who made the apportionment of the taxes which had been levied against those items of property for the year 1922. The tract mentioned in the complaint and in the attacked

decree appeared upon the assessment roll for 1922 as a part of the following properties which were there entered: "N½ of NW¼—SE¼ of SW¼—Lots 1 and 2." Throughout we are omitting mention of section, township and range numbers. The land in dispute was a part of the north half of the northwest quarter mentioned in the language just quoted. Further notations upon the assessment roll identified the assessed properties as 153 acres in extent, fixed their value at $2,000 and entered A. A. White as their owner.

Certificate of delinquency No. 1708 describes as its subject-matter the northeast quarter of the northwest quarter (the property in dispute) and the southeast quarter of the southwest quarter. Thus it is seen that the following parcels, which, together with the two just mentioned, made up the properties upon the assessment roll, were omitted from the delinquency certificate: (1) the northwest quarter of the northwest quarter, and (2) lots 1 and 2. The deed omits one of the two properties described in the certificate of delinquency and conveys title only to the northeast quarter of the northwest quarter. The defendants argue that it was the sheriff who split up the properties and who made the apportionments of taxes necessary to the split-ups. The only foundation for that contention is the fact that Mr. W. C. Templeton, who was assessor of Linn County at the time of the trial of this suit, testified that he was unable to find any record indicating that the assessor's office had made any valuation of the several items of property preparatory to the segregation. Mr. Grant Froman, who was assessor at the times when (a) the assessment roll was prepared, (b) the certificate of delinquency was issued, and (c) the foreclosure decree was entered, died in 1931, a year or more after he signed the tax deed.

The 1922 assessment roll of Linn County consisted of many large sheets which were bound in the form of numerous volumes. Each sheet was ruled and contained four score or so of prepared columns. At the top of the columns was an identifying heading, such as Name of Taxpayer, Description of Land, Date of Redemption, and Total Amount of Redemption. Upon the line of the assessment roll which described the disputed tract we observe various entries which possibly explain the segregation of the 153-acre tract into its lesser units and the apportionment of the tax levied against it into the sums assessed against the smaller units. Some of these entries are the following:

| Date of Payment | Number of Receipts | Amount Paid |
|---|---|---|
| 9- 5-28 | 14402 | $13.81 |
| 2-21-28 | 14388 | 4.26 |
| Certificate of delinquency | # 1708 | |

Still another is the figure 21.26 written in red ink under the heading Amount of Errors and Double Assessments. Two further entries upon the assessment roll indicate that parts of the properties became the subject-matter of Redemption Certificates Nos. 1163 and 1202. Preceding the notation of ''Redemption Certificate 1163'' is the date 9-18-27, and in the column entitled Total Amount of Redemption appears the figure 16.98. The notation of ''Redemption Certificate 1202'' is preceded by the date 2-20-29 and under the column heading Total Amount of Redemption is the amount 39.06. No witness explained the significance of any of those entries nor of others which we have omitted. Further writings upon the assessment roll indicate that parts of the assessed property became the subject-matter of certificate of delinquency

No. 1708 and that the certificate was sold to Linn County August 31, 1928, for $70.68.

It may be that the notations above mentioned, if interpreted by someone familiar with such hieroglyphics, would indicate that the segregations preceding the issuance of certificate of delinquency No. 1708 were properly made and that all of the valuations necessary to the split-ups were fixed by the assessor. It is worthy of notice that all of those notations are upon the assessment roll, which is, of course, a record kept by the assessor.

We now turn to certificate of delinquency No. 1708. It was issued August 31, 1928, approximately one year after the issuance of redemption certificate No. 1163. Certificate of delinquency No. 1708 described as its subject-matter "NE¼ of NW¼ and SE¼ of SW¼." Thus it included the disputed tract. It states that it was issued for the sum of $70.68, including taxes of $42.53, a penalty of $1.28 and interest amounting to $26.37. Written across its face are the words "SE¼ of SW¼ redeemed." No witness indicated the author of that writing. Certificate of redemption No. 1202, previously mentioned, was issued by the sheriff February 20, 1929, to "D. Shanks, guardian of A. A. White" and described as its subject-matter the southeast quarter of the southwest quarter. It acknowledged receipt of the sum of $39.06 made up as follows:

> "Certificate of delinquency No. 1708....$35.34
> Interest on same to date ........................... 3.72"

We have already mentioned the fact that the assessment roll contains a notation of the issuance of the redemption certificate just described including its number, date and amount. After the redemption had been made there remained in certificate of delinquency No.

1708 only the land in dispute. It will be observed that the redemption occurred sixteen days after the entry of the decree and three days before the sale.

The above, we believe, states all the facts revealed by the record concerning the segregation of the land and the apportionment of the tax. Whatever segregation and apportionment took place in the interval after the assessed properties, including the disputed tract, were entered upon the assessment roll and the certificate of delinquency was issued occurred, of course, more than three years prior to the institution of the tax foreclosure suit.

We shall first consider the segregation and apportionment which took place before the entry of the decree, and will later consider the other segregation and apportionment. Our purpose will be to ascertain whether any purported irregularity which occurred prior to the commencement of the tax suit can be considered as a defense in the present suit. We by no means indicate a belief that the foregoing facts show that any irregularity, in fact, occurred.

Chapter 214, Oregon Laws 1927, imposed upon the sheriff, not the assessor, the duty of issuing certificates of delinquency. Hence, certificate of delinquency No. 1708 was issued by the proper official.

Section 69-807, subd. 5, Oregon Code 1930, said:

"A copy of said summons shall be delivered to the sheriff. Thereafter, when any owner of real property or person interested therein seeks to redeem, as provided in this act, the sheriff shall ascertain the amount of costs accrued in foreclosing said certificate or certificates and include said costs as a part of the redemption to be paid, and where more than one tract of land is involved and covered by more than one certificate the sheriff shall pro-

portion said costs to each tract described in said certificates in accordance with the total amount of taxes, penalties and interest due on each of said tracts."

Section 69-819, Oregon Code 1930, said:

"Real property upon which certificates of delinquency have been issued under the provisions of this act may be redeemed at any time before the issuance of tax deed by payment, * * * to the sheriff of the proper county * * * the amount for which the same was sold, together with * * *."

Both of those statutory provisions were in effect at the times with which we are concerned.

Those statutory provisions authorized redemption of any of the tracts which constituted the land described in the assessment roll and permitted it to take place up to the moment of the execution of a tax deed.

Section 4354, Oregon Laws 1920, said:

"The court shall examine each application for judgment and decree foreclosing the tax lien or liens, and if defense, specifying in writing under oath the particular cause of objection, be offered by any person interested in any of said lands or lots to the entry of judgment and decree against the same, the court shall hear and determine the matter in a summary manner without other pleading, and shall pronounce judgment and decree as the right of the case may be; or said court may, at its discretion, continue such individual cases wherein defense is offered, to such time as it may be necessary in order to secure substantial justice to the contestants therein; * * *. The court shall give judgment and decree of such taxes, assessments, penalties, interest and costs, as shall appear to be due upon the several lots or tracts described in said summons and application for judgment and decree, and such judgment and decree shall be a several judgment against and lien upon each tract or lot, or part

of a tract or lot, for each kind of tax or assessment * * *.''

Section 4356, Oregon Laws 1920, said:

"Appeals from the final order, judgment, and decree of the court may be taken to the supreme court * * *. The manner of taking and perfecting appeals to the supreme court and the proceedings thereon, and the determination and disposal thereof, shall conform to and be governed by the statutes for taking appeals in equitable causes, * * *.''

Reverting now to the parcel of property involved in this appeal, it is apparent that the statutes just quoted made provision so that any person who possessed an interest in that property could have submitted for adjudication in the tax foreclosure suit any defense which he believes possessed merit. Every issue presented by the answer in this suit, based upon something which occurred prior to the entry of the decree, could have been voiced in the tax proceeding. Thus, the appellants were not required to wait until the present suit was begun in order to secure an adjudication of their defenses. The institution of the tax foreclosure suit and the publication of its summons called upon the appellants to submit any defense they possessed. The circuit court had adequate power to grant to the property owner any relief which the circumstances demanded. The available remedies were as complete in that suit as in this. And, whereas in the present suit the appellants have made a tender of the delinquent taxes, costs and penalties, no tender was required in the tax foreclosure suit.

In *Hoskins v. Dwight,* 69 Or. 558, 139 P. 922, decided seven years after the adoption of the 1907 act, this court said:

"The statute now in vogue making taxes charged against real property a lien thereon, and

providing for the foreclosure thereof, gives the owner of the premises, upon whom a summons must be served, a day in court where he may present his defense, and affords him an opportunity to be heard before he can be deprived of his land, * * *.''

From *Smith v. Dwight,* 80 Or. 1, 148 P. 477, 156 P. 573, we quote, Ann. Cas. 1918D 563:

"All objection of this kind should have been made by plaintiff in the foreclosure suit, and he is now precluded from making the same by virtue of Section 3710, L. O. L.''

Had the appellants submitted in the tax foreclosure suit the defenses set forth in their present answer, they would have received an adjudication of them. The court possessed full and complete authority to grant them any appropriate relief. Had they been dissatisfied with the decree entered at the end of the hearing, they could have taken an appeal to this court. The appeal, had one been taken, would have been complete and effective.

In fact, the statutes above mentioned not only afforded to all persons interested in the property described in the tax foreclosure suit, including these appellants, an opportunity to submit their defenses, but demanded that such be done under penalty of being foreclosed of the defenses in the event they were withheld. As we saw from the phrase which we took from General Laws of Oregon, 1927, chapter 214, the tax foreclosure suit was ''a proceeding *in rem* against the property itself.'' Its very purpose was to summons to the court every person who had any claim to the property and exact from him his objections, in the event he had any, so that a judgment could be entered at the conclusion of the hearing binding upon the entire world. The submission of their defenses by these appellants was not optional; it was compulsory. The

purpose of the tax statutes before us can be fulfilled only if the decree and judgment which was entered at the end of the proceeding, and which the appellants now attack, is deemed conclusive and immune from attack. By using the word "conclusive" we mean conclusive not only of all matters which were actually adjudicated, but also of all other matters which could have been submitted. But we recognize, of course, that no decree is free from attack if the court lacked jurisdiction. The statutes applicable to the foreclosure of certificates of delinquency render the interpretation just stated inevitable. We now quote from § 110-920, O. C. L. A., which was in effect when this suit was filed:

"Any judgment and decree for the sale of real property to the county, on foreclosure for delinquent taxes, shall be conclusive evidence of its regularity and validity in all collateral proceedings, except where the taxes have been paid or the property was not liable to assessment and taxation. The judgment and decree shall be prima facie evidence that the taxes have not been paid and that the property was subject to taxation at the time it was assessed; and such judgment and decree shall estop all persons raising objections thereto, or to the title based thereon, which existed at or before the date of such judgment and decree and could have been presented as an objection or defense to the application for such judgment and decree. * * *"

Section 4363, Oregon Laws 1920 (General Laws of Oregon 1919, chap. 408, § 6) which was in effect when the challenged decree and judgment was entered was substantially the same as the statute just quoted.

■ Statutes of the above kind protect the tax foreclosure decree from collateral attack. The following is quoted from 34 C. J., Judgments, page 966, § 1381:

"The doctrine of *res judicata* applies as well to tax proceedings as to ordinary litigation between

individuals. Hence a judgment in such proceedings is conclusive as to matters actually or necessarily determined; and, if the same taxes were involved, is also conclusive as to matters which might have been litigated and decided.''

The same rule is thus stated in 51 Am. Jur., Taxation, § 1032, p. 901:

"As a general rule when a tax sale is based upon a decree of foreclosure rendered by a court having jurisdiction of the subject matter, it is not subject to collateral attack on account of irregularity in the proceedings."

We now quote from *Swanson v. Hoyle,* 32 Wash. 169, 72 P. 1011, decided four years before our 1907 legislative session convened:

"If the 97 cents was not properly chargeable against the property, the defendant could have defended against the judgment to that extent. Objections of this character are matters of defense to the original action. They are not matters which could be properly considered in the case at bar, because this is not an action to correct errors. It is one to vacate the whole judgment. If errors which could have been avoided by the appearance of the defendant have crept into the judgment by reason of his default, he cannot complain thereof, after judgment is entered, where the court has jurisdiction."

In *Washington Timber etc. Co. v. Smith,* 34 Wash. 625, 76 P. 267, which was decided three years before the 1907 session adopted our act, the court, in rejecting a collateral attack upon a decree entered in a tax foreclosure suit, said:

"The next objection to the sufficiency of the foreclosure is that the certificates of delinquency were not properly filed in the office of the clerk of the superior court before publication of sum-

mons. \* \* \* The summons and its publication, we think, complied with the law. The property owner was therefore within the jurisdiction of the court, and was required to take notice of the action. The summons was by publication, it is true, but, under § 3, pp. 385, 386, Laws of 1901, 'all persons owning or claiming to own, or having or claiming to have, an interest therein are hereby required to take notice of said proceedings, and of any and all steps thereunder.'

"Appellant insists that, notwithstanding the statutes above cited and quoted, it is not estopped to raise objections now, \* \* \*. With such a provision in our law, and with the positive declaration, quoted above, that all interested persons shall take notice of the steps taken in the cause, we see no reason why the statute shall not be given the force which was evidently intended, notwithstanding the fact that the summons is by publication only. The difficulties attending the collection of public revenue are many at best, and the relation of the citizen to the subject is somewhat different from his relation to the ordinary contractual obligations. He must take notice that by law his property is assessed each year, that the tax is due and delinquent at a fixed time, is a lien upon his land, and, if not paid, that the lien shall be enforced by foreclosure proceedings, and in the manner provided by statute. The action is not *in personam* but *in rem*, \* \* \*."

See to the same effect *Reese v. Thurston County,* 154 Wash. 617, 283 P. 170.

Two years before our act was adopted, the Washington court, in *Rowland v. Eskeland,* supra, said:

"If appellants desired to contest the collection of the taxes because of matters set out in the second and third defenses, they were required to do so in the foreclosure action. These questions can not be tried in this collateral proceeding, under the statutes above cited."

In *Moyer v. Foss,* 41 Wash. 130, 83 P. 12, under another decision announced before our legislature adopted our act, the court said:

"It may have been the right of the holder of the interest to come into the foreclosure proceedings and ask to have the unpaid portion of the tax adjudged to be a lien upon that part of the tract conveyed to the tenant in common on the partition of the property, but this is the extent of the right. On the face of the record, the tax was one for which the land sold was apparently bound. In such a case, the inquiry whether it is in fact bound must be raised in the foreclosure proceedings, else the party is estopped by the judgment of foreclosure from questioning the fact. Smith v. Newell, 32 Wash. 369, 73 Pac. 369; Jefferson County v. Trumbull, 34 Wash. 276, 75 Pac. 876; Washington Timber & Loan Co. v. Smith, 34 Wash. 625, 76 Pac. 267."

In *Colby v. Himes,* 171 Wash. 83, 17 P. (2d) 606, the court, after reviewing several of its earlier decisions, once more held that irregularities which did not affect the jurisdiction of the court must be submitted in the tax foreclosure suit and cannot become the basis of another proceeding intended to defeat the sale and deed resulting from the foreclosure suit.

Without reviewing the authorities further, we state our conclusion that the statutes previously quoted require the owner of property described in a certificate of delinquency, which is under foreclosure, to present in the tax foreclosure suit any and every defense which he possesses. Irregularities such as those averred in the answer to this suit cannot be withheld from the tax suit for the purpose of employing them as the basis of a later attack upon the tax deed. The decree and judgment entered in the tax foreclosure suit is an adjudication, not only of all defenses which were submitted, but

also of all defenses that could have been submitted. It follows from the above that the matters now under review, that is, the segregation of the property and the apportionments of the tax, which preceded the institution of the tax foreclosure proceeding, cannot be considered in this suit. We embrace the principle thus stated in Restatement of the Law, Judgments, § 2:

> "Where a reasonable opportunity has been afforded to litigate rights of all persons in property before a court which has jurisdiction over the property, and the court has finally determined the rights in the property, the interests of the state and of the persons concerned require that the rights in the property shall not be litigated again by anyone."

We come now to the redemption which occurred sixteen days after the entry of the decree and three days before the sale of the property. We have already quoted from the statutes which were in effect when that redemption occurred and which authorized it to be made.

The appellants' criticism of the redemption under consideration is limited to a contention that the sheriff, and not the assessor, made the apportionment of the taxes incidental to the redemption. It is, of course, apparent that a sheriff has no authority to apportion taxes. The appellants, however, lack proof to support their contention, unless the failure of Mr. Templeton to find a record indicating that his predecessor apportioned the taxes constitutes proof that it was the sheriff, and not the assessor, who performed the challenged act.

Mr. Templeton, it will be recalled, did not testify that the sheriff made this apportionment. His testimony was negative in character and went no further than to indicate that a search had failed to locate any

record showing that his predecessor made the valuations incidental to an apportionment of the tax. But even though we have no direct evidence showing that it was the assessor who made the apportionment, Section 2-407, subd. 15, O. C. L. A., requires us to presume that the apportionment was made by the assessor. That section of our laws requires courts, in the absence of evidence to the contrary, to presume that "official duty has been regularly performed." It is clear that M. D. Shanks, guardian of A. A. White, came to the sheriff's office and expressed the desire to redeem the southeast quarter of the southwest quarter. At that point it became the duty of the sheriff to ascertain from the assessor the amount of the tax charged against the southeast quarter of the southwest quarter, and likewise it became the duty of the assessor to give the sheriff the requested information. It is now our duty to presume that the official duty just delineated was performed; that is, that the assessor ascertained the amount of the tax which had been assessed against the southeast quarter of the southwest quarter and gave the sheriff that information. We, therefore, conclude that it was the assessor, and not the sheriff, who determined the amount needed for the redemption of the southeast quarter of the southwest quarter. The balance remaining unpaid after the redemption had taken place was, of course, the tax which the assessor had levied against the northeast quarter of the northwest quarter, being the property mentioned in the complaint. The contention just reviewed, in our opinion, is without merit.

We shall now consider the contention that the judgment and decree entered in the tax foreclosure suit are void because, although no cost bill can be

found in the judgment roll, $3.20 costs was added to the amount called for by the certificate of redemption. The sum of $3.20 just mentioned was added to the judgment by the following provision of the foreclosure judgment and decree:

> "It is therefore considered, ordered, adjudged and decreed: 1. That Linn County, the plaintiff herein, have judgment against the real property hereinafter more specifically and particularly described, * * * and the owners thereof, for the tax assessment, penalty, interest and costs appearing to be due upon the several lots parcels or tracts of land hereinafter more particularly set forth, which judgment shall be a several judgment against each lot and part of lot, block, tract or parcel of land, for the taxes, assessments, penalties, interest and costs, as hereinafter more particularly set forth. 2. That the * * * amounts of taxes, assessments, penalties, interest and costs due and unpaid thereon for the year 1922, * * * are as follows, to-wit: * * * A. A. White, present owner, NE¼ of NW¼ and SE¼ of SW¼ of Sec. 29, Twp. 13, SR 1 E., W. M. containing 80 acres, D. C. No. 1708 issued to Linn County August 31, 1928 for 1922 taxes, amount due $70.68 with 12% int. from said date, and the further sum of $3.20 as costs herein; * * *."

In *Barber v. Newbegin,* 154 Or. 55, 58 P. (2d) 1254, the various statutes which govern the award of costs in tax foreclosure suits are quoted. It is apparent from what is said in that decision that the circuit court in entering its decree in the tax suit was authorized to add costs to the sums for which judgment was rendered. The appellants do not contend that the court was without authority to make an award of costs, but argue that since no cost bill is present in the judgment roll, the judgment and decree entered in the suit is void.

The following is taken from 34 C. J., Judgments, p. 290, § 503:

"A judgment should not be set aside for irregularity in the taxing of costs, or error in the amount as taxed, the remedy being by motion to correct the judgment by reducing or otherwise changing the taxed costs."

In § 864, p. 564, the same authority says:

"If the relief awarded or recovery authorized by a judgment is excessive, either as being greater than the amount demanded, greater than the facts or the evidence would justify, or as improperly including * * * costs * * * it is erroneous and voidable, but may not be impeached in a collateral proceeding."

In the early case of *Nicklin v. Hobin,* 13 Or. 406, 10 P. 835, this court, in an able opinion by Mr. Justice LORD, applied the rule stated in the above-quoted language. In that case it appeared that one Brenan, upon an appeal to the circuit court from a judgment entered in a justice of the peace court, won a verdict for $1.00 against Hobin, the defendant. But the circuit court awarded Hobin a judgment against Brenan in the amount of $62.95 costs. Later Brenan died and still later the plaintiff, as administrator of Brenan's estate, commenced the suit under review in which he prayed for an injunction to restrain Hobin from enforcing payment of the judgment. The circuit court granted an injunction. In reversing that decree, this court said:

"The record shows that the court had jurisdiction of the subject-matter and the parties; * * *. Now, although it may be true that the amount of costs taxed or allowed by the court was wrong, still it was but an error of judgment, not a defect of jurisdiction. * * * The cause was one the court had a right to try, and the parties were properly

present by due process, and the power of the court to hear and determine all matters, including costs, which might arise in the trial of the cause, was complete, and its jurisdiction unaffected one way or the other by the *consent* suggested. The question whether a judgment is right or wrong is a very different one from whether it is valid or void. Although it is the aim of courts to decide rightly, yet the power to decide necessarily carries with it the power to decide wrong as well as right. And where a court has jurisdiction, the judgment or determination is binding and obligatory until reversed, without reference to the question whether it is right or wrong. 'Nor is it any ground for disregarding a judicial determination that one party has got a great deal more than was justly due him.' (Bronson, J., in Sup. of Onondaga v. Briggs, 2 Denio, 34.).

"It may be true that there was error in the judgment, and if there was, an appeal would have corrected the error, but this is without the province of a court of equity."

In *Travelers Insurance Co. v. Staiger,* 157 Or. 143, 69 P. (2d) 1069, we applied the same rule. From that decision, we quote:

"From collateral attack all judgments are invulnerable unless they be void. An erroneous award of costs, made, however, by a court which possesses jurisdiction to tax costs, does not render the award void and the resulting judgment subject to collateral attack."

In *Barber v. Newbegin,* supra, *Wing v. Parrott,* 154 Or. 405, 60 P. (2d) 603, and *Watson v. Jantzer,* supra, attacks upon tax deeds were sustained upon the ground that, although no cost bill had been filed in the tax foreclosure suit, nevertheless, the foreclosure decree made an award of costs. For the reasons which we set forth

in preceding paragraphs, we decline to follow those decisions.

14, 15. We take the following from 21 C. J. S., Courts, § 194b, p. 329:

> "An overruling decision cannot operate retrospectively so as to impair the obligations of contracts entered into, or injuriously affect vested rights acquired, in reliance on the overruled decision."

The same authority, at page 327, points out that a court of final review has the power to limit the effect of an overruling decision so that it will operate prospectively only. See to the same effect 14 Am. Jur., Courts, § 130, at page 345.

■ In the present case, and in future ones of like kind, an erroneous award of costs will not be deemed a sufficient basis for holding either the foreclosure decree or the tax deed void. The award of costs, if deemed by the appellants unwarranted, should have been challenged in the tax foreclosure suit. Such is our interpretation of the controlling statute. It is not now a ground for holding the judgment, decree and deed void.

■ What we said in a preceding paragraph we now repeat: An owner of property subject to taxation is presumed to be familiar with everything done by the public officers in their efforts to subject his property to the payment of a tax. If he neglects to meet his tax liability, he is afforded a day in court before his property can be sold. If he does not then voice his objections to any irregularities that may have occurred, he must be presumed to have waived the objections. Such is our disposition of all the foregoing objections. The contentions based upon them, in our belief,

possess no merit. *Frederick v. Douglas Co.*, (Or.), 155 P. (2d) 925, *Elliott v. Clement*, supra, and *National Surety Corp. v. Smith*, 168 Or. 265, 114 P. (2d) 118, 123 P. (2d) 203, foreshadowed the above result.

Finally, in their attacks upon the tax deed, the appellants claim that the amount derived by the sheriff for the property, $70.68, was grossly disproportionate to its actual value. Concurrently with its purchase, the county cancelled the taxes levied against the property for the years 1923 to 1928, both inclusive, in the following amounts: $19.52, $23.42, $22.10, $19.27, $22.54 and $18.52. The only indication made by the record as to the value of the property is in the following taken from the testimony of one of the appellants' witnesses: "It ought to be worth two or three thousand dollars." Since the witness used the present tense, he probably did not have in mind the year 1929, when the sale occurred. In 1929 the tract was a half mile or so from any road and lacked access to the road. After the plaintiff received its deed it purchased a right of way through land owned by Mrs. Rozell and likewise through land owned by another so that it could reach this tract. It then built the needed roadway. The total spent was $700. Very likely the construction of the road added materially to the value of the property. In *Wing v. Parrott,* supra, this court indicated that a disparity between the market value of property and the sum received for it on a tax sale affords occasion for closely scrutinizing the sale. See to like effect *Smith v. Dwight,* supra.

When the tax sale in the present instance occurred, the appellant, Ada Rozell, and her husband (now deceased) were living upon a tract immediately adjacent to the land in dispute. There is no claim that they did

not know of the sale nor that they lacked means to submit a bid for the property.

In *Colby v. Himes,* 171 Wash. 83, 17 P. (2d) 606, the court said:

"It is unfortunate that respondents have been deprived of property worth $1800 because of their failure to pay taxes thereon amounting to about one-tenth of that sum, but their own negligence caused their loss, and our attention is called to no defects in the tax foreclosure proceeding which are of a nature so serious as to affect the jurisdiction of the court to enter the judgment of foreclosure."

■ We are by no means sure that a considerable disparity existed between the value of the property and the taxes due from it. No irregularity in the sale is indicated by the record. We know of no circumstance which would warrant a conclusion that the deed possessed by the county (respondent) is defective. The validity of the deed is, therefore, sustained.

The above disposes of every attack made by the appellants upon the county's tax deed. We believe that the judgment and decree which preceded the tax sale were valid, and that the deed which followed the sale is free from defects.

So far we have not dealt with the contention presented by the appellant, Ada Rozell, that she owns a one-fifth interest in the disputed tract and that the origin of her title was the purported adverse possession of Jefferson Rozell and his predecessor. Jefferson Rozell died in the year 1896. He was the father of the deceased husband of Ada Rozell. Regardless of what may have been the manner in which the appellant, Ada Rozell, or anyone else, acquired title to the property, the principles of law employed in preceding paragraphs indicate that the foreclosure decree extin-

guished all claim to title possessed by anyone prior to the decree's entry. Those principles barred the claim now asserted, whether based upon adverse possession or any other ground. But, for the sake of completeness, we shall go on and state the circumstances.

A glance at the following map, which is largely a reproduction of one prepared by a witness for the appellants, may help to understand the facts which we shall now state.

The above drawing depicts 160 acres; the northeast quarter of the northwest quarter, the southeast

quarter of the northwest quarter and the west half of the northeast quarter. The defendants claim that the four 40s became known as the Rozell farm and say that all of it, with the exception of the part north of the river, was operated as a unit. The land described in the complaint is the first tract we mentioned (NE¼ of NW¼), but, under the admissions of the answer, the only part of it which is in dispute is the area which lies south of the channel of the river. The defendants claim nothing north of the river. The individual who prepared the plat explained that he inadvertently made the drawing of the river too broad and that he included in the river's outline land which lies north of the channel. The disputed tract is largely a gravel bar and is valuable on that account. It lies low and is subject to overflow at times of high water. There are no buildings or any improvements upon it except a short stretch of road built by the county. A glance at the map will show that the buildings are a quarter of a mile or more away from the disputed tract.

Until the spring of 1941 virtually all of the disputed tract remained in its wild natural state. Most of it was gravel, but here and there brush and vine maples grew. Livestock could find grass in occasional spots. In the southeast corner is a small patch, possibly three acres in extent, which is suitable for cultivation and which has been tilled, off and on, over an extended period. However, it is not involved in this suit. After the county received a deed to the 40-acre tract as the culmination of the tax foreclosure suit, it sold and conveyed the small tillable patch to one Paul M. Duncan. The rest of the tract remained in its wild natural state. Livestock visited it for pasturage purposes, and H. Rozell, a son of his co-defendant, Ada Rozell, in recent

years took some gravel from the gravel bar. In short, until the spring of 1941, the disputed tract was wild land. A visit to it would have found no evidence indicating that anyone was in possession or that anyone was making.claim of title to the tract. The property immediately south of these four 40s is owned by the aforementioned Paul M. Duncan. It will be observed that the plat indicates a road upon the northern extremity of his property, and that the road at its western extremity approaches the river and there turns north through the southeast quarter of the northwest quarter. At the northern terminus of this road lies the gravel bar. That is the road which we mentioned in a preceding paragraph. The plaintiff built it so that it could gain access to the gravel bar. After it had hauled out over that road in 1941 several thousand yards of gravel, some barricades were placed across the road and a fence built by the county was destroyed. Then this suit was filed.

The tax foreclosure decree, as already stated, was entered February 4, 1929. The sale occurred February 23, 1929, and the deed to the county was recorded in the deed records September 3, 1929. The present suit was filed September 2, 1941. We do not understand that the appellants claim that between the dates of the foreclosure decree and the filing of the suit, the appellant, Ada Rozell, acquired title through prescription. Rather, it is our understanding that the appellants claim that there descended to the appellant, Ada Rozell, and several others a prescriptive title which one Jefferson Rozell had acquired, so the appellants claim, to the disputed tract long prior to the institution of the tax foreclosure suit. The following states the circumstances.

In 1872 a corporation, entitled Willamette Valley and Cascade Mountain Road Company, was the owner of the northeast quarter of the northwest quarter (the land in controversy) and of the northwest quarter of the northeast quarter. Title to the southeast quarter of the northwest quarter and to the southwest quarter of the northeast quarter reposed in the United States Government and remained there until the aforementioned Jefferson Rozell, in 1895, won title to those areas through the homestead laws.

October 21, 1872, the aforementioned company executed and delivered to William Z. Ames, father of the appellant, Ada Rozell, a deed which described the west half of the northeast quarter. It will be observed that that description included the southwest quarter of the northeast quarter, a 40-acre tract which the grantor did not own, but did not include the property in controversy. The appellants contend that the wagon road company must have intended to convey to Ames the northeast quarter of the northwest quarter, being the tract in dispute and which it actually owned, but we find in the record no supporting evidence.

August 7, 1874, Ames executed and delivered to Nathan Williams a deed which contained the same description which the wagon road company had employed in its deed to Ames. Williams built upon the property a meager house and another building or two. By glancing at our map, it will be seen that it contains some indications of buildings; one or two of those are structures which Williams built. None of them was constructed in the contested area. Williams cultivated some of the land and pastured livestock upon the nontillable parts. It is claimed that he built a fence on the east side of the tract, another on the south line, and deemed the river as the other sides of an enclosure.

In that way, it is argued, he included the disputed land in an enclosure.

July 1, 1879, Williams executed and delivered to the aforementioned Jefferson Rozell a deed which contained the same description employed in the deeds signed by the wagon road company and Ames. January 3, 1895, Rozell acquired title through patent from the United States Government to the southeast quarter of the northwest quarter, the southwest quarter of the northeast quarter, the northwest quarter of the southeast quarter and the northeast quarter of the southwest quarter. He moved upon the place and remained there until his death, intestate, May 9, 1896. The appellants claim that Rozell took possession not only of the four quarters above mentioned, but also of the land in dispute, together with the northwest quarter of the northeast quarter. If that is so, he then had possession of 240 acres of land. The appellants also claim that Rozell built a fence marking the east boundary of the 240 acres and another one marking the south boundary line. According to them, Rozell depended upon the river as the remaining part of the land's enclosure. If these contentions are correct, the south boundary line was a half mile distant from the south line of the disputed tract. Livestock belonging to Jefferson Rozell pastured at times in the disputed area and it may be that he cultivated the small patch, three acres or so in extent, now possessed by Paul M. Duncan.

The appellants argue that the purported possession of Nathan Williams, when tacked on the alleged possession of Jefferson Rozell, yielded title to the disputed tract to Rozell by prescription. In that way, according to the appellants, Rozell became owner of the land in controversy. It is claimed that he was still the owner when death overtook him, May 9, 1896.

Jefferson Rozell was in debt at the time of his death, and March 13, 1897, one of his creditors was appointed administrator of his estate. Later, the administrator was directed to sell the southeast quarter of the northwest quarter, the northeast quarter of the southwest quarter and the west half of the northeast quarter in order to obtain funds for the discharge of indebtedness. May 23, 1898, the property was sold to R. B. Montague. It will be observed that the descriptions did not include the tract now in controversy; in fact, the latter was nowhere mentioned in the probate proceedings, and, so far as the records of the estate indicate, Jefferson Rozell had made no claim to it.

The appellants argue that, since the tract was not conveyed by the administrator's deed, it therefore passed by descent to Jefferson Rozell's heirs. One of the latter was Hezekiah Rozell. He died in 1931; the appellant, Ada Rozell, is his widow and sole devisee. Besides Hezekiah four other individuals were heirs of Jefferson. In 1902 they instituted a suit in which they challenged the validity of the administrator's sale. The suit failed. We observe that in the suit the plaintiffs did not claim that Jefferson Rozell owned the northeast quarter of the northwest quarter.

July 21, 1898, R. B. Montague and his wife conveyed the properties granted to them by the administrator's deed to O. W. and O. C. Stone, brothers. In 1908 the Stones, by deed, partitioned the property between themselves. One or the other of them remained upon the property until 1918 or 1919. In the meantime, they improved the land by construction of a dwelling house. O. C. Stone, the surviving brother, testified that when they acquired title there were no boundary fences upon the property. He declared that they were advised of

the wagon road company's title to the 40-acre tract in dispute, and that in 1908 they had a surveyor run the lines so they would know the extent of their holdings. He and his brother made no claim whatever to the ownership of the disputed tract and recognized the wagon road company as the owner of it. His testimony is not challenged by the appellants; to the contrary, their brief states:

"O. W. Stone and O. C. Stone claimed no ownership of the lands in litigation herein during their joint occupancy of the other lands of said Rozell farm. * * * During the time the Stones held title to the other lands of said Rozell farm they made no claim to the lands in litigation."

Thus, for a period of twenty-one years, the owners of the Rozell farm made no claim to the disputed tract. In 1918 the Stones conveyed the northwest quarter of the northeast quarter and the southwest quarter of the northeast quarter to Louise Birtwhistle, who, in 1923, conveyed those properties to the aforementioned Hezekiah Rozell. September 2, 1924, Hezekiah executed a mortgage to the Federal Land Bank of Spokane to secure payment of the sum of $2,300. It did not mention the tract in dispute. When he died in 1931, the appellant, Ada Rozell, as his widow and sole devisee, assisted in the preparation of the inventory of the estate. It made no mention of the disputed tract, which the answer swears was worth $10,000—a sum much larger than the appraised value of the estate.

Without relating the facts further, we now state, in the words of the appellants' brief, the manner in which it is claimed that the appellant, Ada Rozell, became a joint owner of the disputed tract:

"The adverse possession by Jefferson Rozell of the said lands ripened into a perfected fee simple

title by prescription on the 1st day of July, 1889, which dated from its inception on July 1st, 1879, disseizing the Willamette Valley and Cascade Mountain Wagon Road Company and all the world from that date, and on his death, on the 9th day of May, 1896, this title descended to his heirs, to-wit, H. Rozell, J. W. Rozell, Ida Cross, Christopher C. Rozell and Benjamin F. Rozell, and on the death of said H. Rozell, on the 18th day of March, 1931, his title descended by devise to his widow, the defendant Ada Rozell, and that the fee simple title by prescription to the said lands is now vested in the said defendant Ada Rozell, and the other heirs of said Jefferson Rozell, deceased, with the said defendant Ada Rozell in possession for the use and benefit of herself and her said co-owners.''

If the quoted words reflect the facts, Ada Rozell owns a one-fifth interest in the disputed tract, and the sister and three brothers of her deceased husband own the other four-fifths. Whether or not the sister and three brothers believe that they own a four-fifths interest in the property was not disclosed at the trial. None of them are parties to this suit and only one of them, J. W. Rozell, testified. If he thought that he owned any part of the tract, he did not mention the belief. It was not disclosed at the trial whether Ida Cross, Benjamin F. Rozell and Christopher C. Rozell are still living.

The above proposition declares that long before the tax foreclosure suit was filed, title to the disputed tract had been won by Jefferson Rozell through the purported adverse possession of him and his predecessor in interest. Following Jefferson Rozell's death, as the appellants concede, all of the property listed in his estate was sold to satisfy the demands of his creditors, but it is claimed that this 40-acre tract, purportedly acquired by adverse possession, escaped the

attention of the creditors and descended to the above group of five heirs. Following Jefferson Rozell's death there came the period of twenty years or more, which we have already mentioned, in which no occupant of the so-called Rozell farm (the 40s to the east, southeast and south) avowed ownership of the disputed tract and in which none of the heirs mentioned in the above quotation voiced any claim to the ownership of this property. The appellants argue that although in that period no Rozell claimed ownership of the disputed tract or paid taxes upon it, nevertheless the title reposed in the five heirs. In 1924 Hezekiah Rozell purchased the Rozell farm and moved into the house represented on our drawing. Since his death in 1931 the appellant, Ada Rozell, as his widow, has continued to live there. Her annual tax returns, made over her signature, do not list the disputed tract. It is agreed that Hezekiah never paid any taxes upon the tract with which we are concerned.

■ The foregoing will suffice as a review of the evidence which pertains to the issue of prescription. The best that this evidence indicates is that livestock belonging to Jefferson Rozell and his predecessor in title, as well as other livestock belonging to Hezekiah, pastured upon the disputed tract; that Jefferson Rozell, and possibly his son Hezekiah, may have farmed occasionally a part of the disputed tract; and that in recent years a son of Ada Rozell removed some gravel from the gravel bar. The son asserts no title in himself and no one claims that his action won title for his mother. The livestock of the Rozells was not the only cattle that were found upon the property. Other livestock, at periods of low water in the stream, crossed the latter and visited this tract. We are by no means sure that any part of the disputed tract was ever farmed,

with the exception of the small area now owned by Duncan. Constantly from the very beginning the nature of the 40-acre tract was wild land. There were no indications that anyone was claiming ownership. We are thoroughly satisfied that the conduct of Jefferson Rozell and of his predecessor in interest failed to gain title by adverse possession to this wild, unfenced land. *Reeves v. Porta,* 173 Or. 147, 144 P. (2d) 493; 2 C. J. S., Adverse Possession, § 29.

■ Further, we express our belief that the time for the appellant, Ada Rozell, and her husband to have asserted claim to an interest in the property mentioned in the complaint was in the course of the tax foreclosure suit. The summons in that suit was to everyone in the world, including those who claimed title through prescription. The purpose of that suit was to litigate and adjudicate all claims to title. When the summons was published, if the appellant and her husband thought that they possessed the interest in the property which we mentioned in a quotation from the appellants' brief, they should not have failed to submit a defense. The nature of their claim to ownership would not have been material unless they could have shown that the county's claim lacked merit. Their failure to submit in the tax foreclosure suit the defenses which they now seek to maintain estops them from now attacking the county's title. We, therefore, conclude that the appellants are foreclosed by the decree entered in the tax suit.

■ The appellants next contend that their motion for a change of venue should have been sustained. It was based, in part, upon a contention that the averments of the complaint disclosed nothing of an equitable nature and that, therefore, the cause was triable before a jury. The complaint alleged successive trespasses.

with threats of a continuance of the unlawful conduct. *Chapman v. Dean,* 58 Or. 475, 115 P. 154, fully justified the circuit court's ruling that the complaint stated a cause of suit entitling the plaintiff to the remedy of an injunction. Hence, the appellants were not entitled to a trial by jury. The motion for a change of venue was properly denied. *Multnomah County v. Willamette Towing Co.,* 49 Or. 204, 89 P. 389.

The above disposes of every contention presented by the appellants. We have not mentioned in this opinion every authority cited by their brief, but all of them have received careful consideration.

The judgment of the circuit court is affirmed. Costs and disbursements will be allowed to neither party.

LUSK, J., concurs in the result.