Argued May 3, affirmed December 30, 1955

## KEENEY *v.* PILOT ROCK LUMBER Co. ET AL
### 291 P. 2d 735

*Harold Banta,* Baker, argued the cause for appellant. On the briefs were Wilson & Olson, John Day, and Banta, Silven & Horton, Baker.

*Edward J. Clark* argued the cause for respondents. On the briefs were Peterson, Clark, Clark & Peterson, Pendleton.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Joe Keeney, from a decree of the circuit court which dismissed

his suit to quiet title to a tract of land situated in Grant county, which is the subject matter of this suit.

The plaintiff is the son and sole heir of one Frank Keeney, who died in 1945, and in whom the record title to the above-mentioned tract was vested October 21, 1935. On the day just cited, the circuit court for Grant county, in a general tax foreclosure proceeding, entered a decree which, if valid, foreclosed the lien of delinquent taxes which had been assessed in 1930 against the property in question as well as against other parcels owned by diverse persons. The suit was entitled *Grant County v. Edna Arnold, et al.* April 4, 1936, Grant county, by deed of conveyance, conveyed title to the property involved in this suit to one Lillis D. Gerking, provided that the decree just mentioned was not void. Lillis D. Gerking and her husband, Martin B. Gerking, had been in possession of the property since March 1, 1930. For the first two years after the day last mentioned their possession was held as lessees of Frank Keeney. May 18, 1948, the Gerkings executed a deed of conveyance which conveyed title to the property to the defendant-respondent, Pilot Rock Lumber Company, if the Gerkings possessed title at the time the deed was executed. The defendant-respondent, Travelers Insurance Company, is the mortgagee of the Pilot Rock Lumber Company. June 27, 1944, in a decision entitled *Elliott v. Clement,* 175 Or 44, 149 P2d 985, 151 P2d 739, this court held that the summons, which was published in *Grant County v. Edna Arnold, et al.,* was indefinite as to the time within which the defendants were required to appear and thereby failed to comply with the governing statute. The decision concluded that the decree entered in that proceeding was void.

Resort to the pleadings reveals the issues sub-

**158**

mitted by this appeal. The complaint avers that on the day it was filed, the plaintiff, as sole heir of Frank Keeney, was the owner of the property. The answer, in addition to denying the parts of the complaint which allege that the plaintiff was owner of the property, submits six affirmative defenses. A sufficient impression of their nature is afforded by the following which we take from respondents' (defendants') brief:

"* * * The first defence alleged that the tax foreclosure of 1935 was valid. The second defence pleaded Section 69-845, Oregon Laws 1930. The third defence pleaded Section 110-920, O.C.L.A. insofar as it might be held applicable. The fourth defence pleaded Section 9-103 O.C.L.A., the ten year Statute of Limitations. The fifth defence pleaded, in substance, the same matter as the fourth defence in terms of adverse possession. The sixth defence pleaded elements of laches and equitable estoppel."

Section 69-845, Oregon Laws 1930, provided:

"Every action, suit or proceeding which may be commenced for the purpose of determining the validity of a sale of lands for taxes, * * * shall be commenced within three years from the date of the sale for taxes * * *."

Section 110-920, OCLA, in addition to specifying the effect which should be accorded to judgments and decrees entered in tax foreclosure proceedings, declared:

"* * * Every action, suit or proceeding, of whatever kind or nature, which may be commenced for the purpose of determining the validity of a sale of real property on foreclosure for delinquent taxes, or to quiet title against such sale, or to remove the cloud thereof, * * * shall be commenced within two years from the date of the judgment and decree of foreclosure * * *."

Section 9-103, OCLA, said:

"A suit shall only be commenced within the time limited to commence an action as provided in chapter 2 of title 1 of this Code; and a suit for the determination of any right or claim to or interest in real property shall be deemed within the limitations provided for actions for the recovery of the possession of real property; * * *."

The section of chapter 2 of title 1 which is germane to this suit is § 1-202, OCLA, which follows:

"The periods prescribed in the preceding section for the commencement of actions, shall be as follows:—

"Within ten years, action for the recovery of real property, or for the recovery of the possession thereof; and no action shall be maintained for such recovery unless it appear that the plaintiff, his ancestor, predecessor, or grantor was seised or possessed of the premises in question within ten years before the commencement of such action; * * *."

■ It will be observed from the quotation which we made from the respondents' (defendants') brief that the defendants contend that "the foreclosure of 1935 was valid." In other words, the defendants do not agree with *Elliott v. Clement,* supra, which held the foreclosure invalid. We shall now consider their attack upon that decision. The summons in *Grant County v. Edna Arnold, et al.,* required the defendants in that proceeding "to appear within sixty days from and after date of service upon you, exclusive of the first day of said service." Section 69-816 OC 1930 provided for service by publication in proceedings for the foreclosure of the lien of delinquent taxes and § 69-807 OC 1930 required the summons in such proceedings to direct the defendants "to appear within sixty days

after the date of the first publication of the summons, exclusive of the date of said first publication." Because the published summons did not specify any definite or certain time within which the owner, supposedly delinquent, was required to appear, *Elliott v. Clement,* supra, held that the summons which was employed failed to meet the demands of the statute. It pointed out that the summons did not indicate that the "date of service" was the day when the first publication occurred. Accordingly, the opinion held that the trial court lacked "jurisdiction to enter a decree, the sale on foreclosure to the county was absolutely void, the county acquired no title, and the plaintiff acquired no title from the county." The decision was approved and followed in *Kaneaster v. Welch Jr.,* 183 Or 547, 194 P2d 410, and *Keerins Bros. v. Mauney,* 189 Or 651, 219 P2d 753, 222 P2d 730. Prior to the contentions advanced by these defendants, the soundness of *Elliott v. Clement* was not questioned. Their attack upon that decision is based in part upon § 69-820 OC 1930, particularly upon the words "so far as applicable" found in that section. We have given their argument careful consideration but have found no merit in it. The defendants' other major attack upon *Elliott v. Clement* cites in its support *Stadelman v. Miner,* 83 Or 348, 155 P 708, 163 P 585, 163 P 983, which held that when a defendant receives some notice from a published summons, a lack of complete compliance with the governing statute renders the judgment voidable, but not void. In the Stadelman case, the published notice complied in full with the statute, but judgment in that case was rendered before publication was completed. The rendering court had jurisdiction, though it was misapplied. The decision held that, since the defendant had notice, he could have attacked the court's premature judgment

by appearing. The holding in that case has no bearing upon the situation in *Elliott v. Clement,* where the failure to comply with the statute denied the court jurisdiction to take any action whatever. We are satisfied that *Elliott v. Clement* was correctly decided.

We now proceed to other issues presented by the defendants-respondents. Their answer pleads the ten-year statute of limitations, not only as a limitation bar, but also as the basis for a contention that the Gerkings won title to the property by adverse possession. We will now consider those contentions.

The real property which is the subject matter of this suit is located in Grant county and lies astride the North Fork of the John Day river about 20 miles north of a community known as Long Creek. The tract is about three miles long running east and west. The western end is about three fourths of a mile wide, but the eastern part is narrower, possibly about a fourth of a mile broad. The tract comprises 607 acres. Until recently access to it was confined to a trail, unless a passageway, which was termed by an occasional witness as a wagon road, constituted an additional approach. Maps received in evidence bear no indication of a road, but have dotted lines which denote the trail. It may be that the ''wagon road'' was nothing other than the trail. In short, until recent years this tract was difficult of access.

The property lies at an elevation of 3000 feet in the rugged, mountainous, rimrock country of central Oregon. Except at its western extremity the property partakes of the characteristics of the surrounding territory. However, the western end is less rugged and contains three spaces that are less declivous. The witnesses referred to them as meadows. The largest contains 27 acres and all three comprise about 40 acres.

Apart from the three meadows, the land contains a stand of timber.

The raising of beef cattle and possibly of hogs was deemed until recently as the only useful purpose to which the tract was adaptable. It was useful as a cattle ranch because (a) its meadows enabled the rancher to raise hay for winter feeding, (b) the stream which flowed through its length offered water to the cattle, and (c) the size of the property provided range for a large number of cattle. We have mentioned the fact that the property contains a stand of timber. Beyond this property are other parcels which also possess timber, and access to them lies through this tract. Following the close of World War II the price of timber advanced so greatly that remote forested land, which some years ago was deemed valueless, found willing buyers. Considerations of the kind just mentioned induced the Pilot Rock Lumber Company, as long ago as 1941, to consider this property. May 18, 1948, that concern and the Gerkings agreed upon a price for the property and thereupon the company received a deed of conveyance. Thereafter the Pilot Rock Lumber Company constructed a graveled logging road 20 miles long which began at a public thoroughfare and upon reaching this property stretched across it and into other timber which the company had acquired. The road enables trucks to haul logs produced in the area to the mills. In that way the tract has been rendered readily accessible and its stand of timber has greatly enhanced the value of the property.

We now return to pertinent incidents in the earlier development of the property. About 1903 an individual by the name of James E. Clark acquired the tract and began to live upon it. He used the property for the running of cattle. In 1916 Clark sold it to one Frank

Hathaway, who, in 1920, conveyed it to Frank Keeney, the father of the plaintiff. Before Keeney acquired the property it had been improved so that it contained not only the corrals, fencing and similar equipment generally found upon a ranch, but also a dwelling house. The house, two stories high, had ground floor dimensions of 18 by 30 feet. It was constructed of logs, but included such appointments as a fireplace and a bathroom. The ranch equipment comprised in part a barn and another structure which the witnesses termed a blacksmith shop. The corrals, two in number, rose to a height of six feet and were built of heavy logs. The large meadow was equipped with a hay stacker. A cable stretched across the river and enabled people to cross it. Wire fences surrounded the meadows and other fencing enclosed most of the 607-acre tract. At places where steep rimrock was near the boundary line and barred cattle from crossing, fencing was omitted. An irrigating ditch brought water upon the place in the earlier years. A small number of fruit trees stood upon the property but they were of slight utility. Such was the character of the place when Frank Keeney acquired it in 1920. In the years we have mentioned the owner and his family lived in the log house and maintained a vegetable garden adjacent to it. The place was operated as a cattle ranch. Apart from the meadows from which the cattle were excluded by the fences, they grazed over the land. When winter came they were driven into the enclosed meadows where they were fed from hay which the meadows had produced.

Frank Keeney, who acquired the property in 1920, evidently found interests which beckoned him to a greater extent than this ranch. During his ownership he neglected its maintenance and it is doubtful whether

he lived upon the property for more than a year. While he possessed it he borrowed from one Allen Porter $878 and secured repayment with a mortgage which described the property. The debt was never paid, but after Keeney (Frank) had quit the property he declared that he had "turned the ranch back" to Porter in satisfaction of the debt. No deed to Porter has been found and the record reveals neither a satisfaction nor a foreclosure of the mortgage. Evidence, however, indicates that Keeney told the assessor that he could not redeem the property from the mortgagor, and that Porter should be regarded as owner. The assessment rolls for the years 1923 through 1927 entered Keeney as owner, but in the period 1933 through 1935 Porter appeared as owner in the assessor's records and in 1936 Porter's estate was recorded as owner. By 1935 the unpaid taxes totaled $716.95. A witness testified that after Porter had been listed as owner of the property he told the assessor to discontinue the practice and in explanation said that he "was out more money on the land than he could ever recover."

When Frank Keeney died, his son, the plaintiff, was unaware of the fact that his father had ever owned the property in question. The son was 29 years of age when he testified and evidently was born after the father had left the ranch to engage in ventures elsewhere. The inventory of the father's estate made no allusion to the ranch.

We have described the tax foreclosure proceeding which Grant county maintained and which named as one of the delinquent properties the ranch in question. The decree in that suit was entered October 21, 1935, and on November 2, 1935, upon foreclosure sale, the county was awarded this tract. Thereupon the county assumed that it was the owner, and in 1936 entered

into a contract with M. B. Gerking whereby he agreed to purchase the ranch. He made an initial payment of $182 and bound himself to pay a like sum annually until April 4, 1940. The agreement stipulated that the property should at once become subject to assessment for taxes.

Sometime after M. B. Gerking had entered into the agreement with the county court to purchase the property, he assigned the contract to his wife Lillis. The annual installments exacted by the contract were maintained and all taxes assessed against the property were paid by the Gerkings. In due time the county issued to Mrs. Gerking the required deed to the property.

Before 1936, when Gerking entered into a contract with the county to purchase the ranch, he had attempted to buy it from Allen Porter under a belief that Porter was the owner. The year when the attempt was made was either 1932 or 1933. Gerking owned a sizeable ranch near the one with which this suit is concerned and after his purchase from the county held under lease still other areas. He was in the business of raising livestock and the evidence indicates that large operations offer the better prospects. It is clear that he earnestly wished to own this tract of land.

Upon the issue of adverse possession, the testimony of the Gerkings is peculiarly material. No other person who testified was as familiar with this property during the 14-year period in which they claim they held possession adversely as those two persons. That was necessarily true, because during many days of the 14-year period no eyes fell upon the property except those of the Gerkings. We believe that the testimony of those two persons was persuasive. The two seemingly had no interest to serve when they testified. Their

deed to the Pilot Rock Lumber Company, which was one of bargain and sale, contained this clause:

"The purpose of this deed is to convey to grantee all of the land herein described, but this deed does not contain any warranty or guaranty of any kind; and the grantors, or any one or more of them, shall not be required to warrant and defend the title to said land, or the title to any part of said land, grantees taking title thereto in such condition as the title may now be in."

The plaintiff does not contend that the Gerkings had any interest in the outcome of the suit, and made no effort whatever to show that they were unreliable sources of the facts.

From the above, we see that when the Gerkings moved upon the property they did so at the outset as Lessees of Frank Keeney, in whom the record title was vested. Before long Keeney lost interest in the property and moved away from the community. When he did so he preferred to deem his mortgagee, Allen Porter, as owner and so told the assessor. Porter, in turn, could find no hope in the place and directed the assessor to discontinue his practice of entering his name as owner. Neither Keeney nor Porter paid the assessed taxes and both neglected maintenance of the property. Such was the state of affairs a couple of years or so after the Gerkings had moved upon the place. When Frank Keeney left the property he attempted to sell his furniture and other belongings to the Gerkings. It is clear that the Gerkings wanted the ranch for they attempted to purchase it from Porter. Although the evidence is vague, the Gerkings made claim to ownership even before they entered into a contract with the county for the acquisition of the property. Following the execution of the contract with the county, the Gerkings deemed themselves as owners

and were so regarded by all others who were familiar with the place. Their names appeared upon the assessment and tax rolls as owners.

While the Gerkings resided upon the property there lived with them their two children and Mr. Gerking's father. They operated not only the ranch in question, but also another, which some identified as the Gerkings' homestead, and a large tract adjacent to the ranch with which this suit is concerned. A witness testified that a rancher who operates more than one property is required to have more than one headquarters and, therefore, cannot live constantly upon any one of his ranches. By headquarters the witness meant a place equipped with corrals and which has pastureland upon which winter feed can be grown. He also had in mind a place where water is available for the livestock and upon which a house stands in which the rancher can live. The Gerkings made no claim that the entire family lived each day of the year upon the ranch in question, but their testimony warrants a belief that until 1944 at least, the members of the family spent many days of the year upon the ranch with which we are concerned. We mention 1944 specifically because in that year the house was destroyed by fire. Even when the entire family was not upon the property, one or more members of the family may have been there attending to the livestock. We take the following from Gerking's testimony:

"A I maintained a residence there.

"Q And you had a son and a daughter growing up?

"A Yes.

"Q Did they help you in your operations on that place?

"A Yes.

"Q Was your wife there too, some of the time?

"A Part of the time.

"Q How soon after '36, to the best of your recollection now, was it that you started running stock as owner of those lands?

"A Immediately. In fact, I ran stock on those lands I had adjoining it right there for a great many years."

Mrs. Gerking gave testimony similar to that of her husband. The Gerkings kept a cow upon the property which provided the family with milk, and several horses so that the members could get around. As many as 200 head of cattle were upon the ranch at times, and evidently their number was never less than 20. A haystack and a haystacker stood in the large meadow. Farming equipment was kept regularly upon the place. We again quote from Gerking's testimony:

"Q And was this use of the property continuous and unbroken by yourself and your wife from '36 or thereabouts until '48, when you sold to the Pilot Rock Lumber Company?

"A Yes."

Gerking plowed the pastures and seeded them to winter feed. Some years only a small part of the total acreage was plowed. In short, this ranch was operated in substantially the same manner as others of similar character. All of its features were put to their intended use, and by their daily course of action the Gerkings proclaimed their ownership of the property. The gates which led into the property generally were closed and signs were nearby which read "No Trespassing."

Mrs. Gerking, whose interest seemingly was more concerned with the success of the ranching venture than with the appointments of the log structure, related

the manner in which she helped to repair fences, bring in livestock, milk the cow and discharge other phases of the ranch work. We take the following from her testimony:

"A   I rode after the stock some and did whatever was necessary. I cooked for the family, milked some cows, hoed in the garden, and even helped in the field if I was needed there."

She also mentioned the vegetable garden which she cultivated and made some references to the fruit trees. Referring to the hay, she gave the following testimony:

"Q   What did you do with the stacks?
"A   Fenced them, fed them out in the wintertime.

"Q   How were they fed out, if you know; would it require somebody to go there?
"A   Yes.

"Q   Or run up there?
"A   Sometimes they went in every day and fed them from the other place. They were sometimes feeding both places. They would feed one place and go to the other ranch and feed.

"Q   What were the other 'sometimes'?
"A   Sometimes there would be somebody stay there and feed."

Mrs. Gerking's testimony indicates that the family regarded this place as their own and as their home. The Gerkings lived upon it to as great an extent as is possible for a family engaged in the operation of more than one ranch. However, in 1944, when the house was destroyed, some change in their use of the property occurred. We will later consider the evidence upon that score.

When the Gerkings moved upon the property, some of the fences had been neglected. Gerking restored

them and his neighbors testified that after he had done so his fences compared favorably with others in the area.

All parts of the fence which was intended to enclose the 670-acre ranch did not stand upon the true boundary line. Possibly two or three segments were distant from the line about a quarter of a mile, but, unless we have misinterpreted the ambiguous ''here'' and ''there'' references of witnesses who pointed to places upon the map, those segments, with a single exception, stood upon land which Gerking either owned or held under lease. Witnesses declared that in the area of this ranch, land values were slight and that accuracy in the placing of fences was not important. Two witnesses who testified had been employed by Gerking in the repair of fences. Gerking mentioned a third neighbor whom he had at one time employed upon this ranch in fence building. It is evident that for many years and up until possibly a year or two before Gerking sold the property he maintained his fences in the same condition as his neighbors.

We have mentioned the fact that Gerking always had upon the property a large number of cattle. One year he had in addition 50 hogs. In order to provide for them he built some additional fencing which, according to the witnesses, had to be constructed hog tight.

Although some of the fencing did not stand upon the true boundary line, the evidence indicates that the Gerkings claimed ownership of every part of the land within their enclosure. More than one witness who ran cattle upon nearby ranches testified that when his cattle found a breach in the fencing and strayed upon Gerking's place, Gerking took possession of the estray. Upon the neighbor's request, the estray was promptly

surrendered. Those incidents, as recounted by the witnesses, indicate that Gerking claimed ownership and that his neighbors deemed him owner and in possession. The fact that cattle could get beyond the fences and enter upon Gerking's ranch does not indicate that his fences were ill kept. Witnesses explained the manner in which breaches occur in ranch fences and all seemingly agreed that no fence is cattle-proof.

We have mentioned the fact that the entire Gerking family did not live constantly upon the ranch, and took notice of the fact that their maintenance of two or three ranches required them to resort to a nomadic type of life. Another fact which seemingly shaped their course was the difficulty of getting their children to school. During the school year it was desirable to live in a locality which was near a school and that fact influenced the movements of the family. The record contains the names of several schools which the children attended. It seems fair to reason that the family would not have lived any differently if the parents had had title to this ranch from an unimpeachable source.

The above indicates the nature of the Gerkings' occupancy of this place until 1944. Their operation of two or three large areas and the schooling of their children imposed upon them a shuttlewise type of living. But they constantly returned to the log house until fire destroyed it. Even when all members of the family may have been absent from the place, their cattle were grazing there. The corrals, haystacks and farming equipment could always be seen upon the place. One rancher, speaking of the Gerkings' place, put it this way: "They was always grub and a bed you could always move in and stay all night any time you wanted to. They always kept enough there."

Such was the state of affairs up to 1944 when the house burned to the ground. Up to that year there can be no question but that the Gerkings were in possession and claimed ownership. Throughout the area they were deemed owners, and their exercise of domain over the property was everywhere respected. They conducted the place no differently than others who had obtained title from an unquestioned source. In fact, if anyone questioned the Gerkings' ownership, he did not testify.

In a year which is not free from dispute, the log house burned to the ground. We have carefully considered the evidence which was offered in an effort to reveal the year and have concluded that the house burned in 1944. According to the evidence, the Gerkings continued to occupy the property after the house was destroyed. Mrs. Gerking testified:

"Q  Where did you live after the house burned?

"A  We camped there part of the time.

"Q  What did you live in?

"A  Part of the time we lived under a tree; part of the time we lived in this cabin.

"Q  When you refer to the 'cabin' what building has been described in the testimony?

"A  Well, it is a cabin, blacksmith shop, whatever they want to call it; this little shed there.

"Q  How long did that method of living continue?

"A  Until they got the hay up.

"Q  I mean how long with respect to your selling to the Pilot Rock Lumber Company.

"A  Until 1948."

Gerking gave similar testimony. The record indicates that members of the family visited the property frequently after the house burned and that the presence of one or more of them was necessary every day when

the cattle had to be fed from the hay in the stacks. We think that after the destruction of the house the Gerkings' habitancy of the place assumed the aspects of camping rather than that of residence. It is clear that they continued to operate the place as a ranch and that they ran substantially the same number of cattle upon the place as before. Although the house was gone and their personal occupancy of the place assumed the form of camping, their use of the corrals, pastures and range went on as before.

There can be no doubt that the Gerkings continued to use the property as a ranch after the house was destroyed, for after their sale to the defendant, Pilot Rock Lumber Company, they rented the property for two years and ran their livestock upon it in the same way as they had done previously.

In their later years of occupancy of the ranch, the Gerkings did not maintain the fences and the corrals as well as when they first went into possession. That may have been due to the impending sale of the property, negotiations for which had their inception as early as 1941. Whatever may be the truth of that matter, it is clear that the Gerkings were in possession of the property, that they excluded all others and were everywhere regarded as owners.

The above constitutes a sufficient portrayal of the facts. Our statement is in harmony with the findings of facts entered by the trial judge.

The elements of adverse possession are well settled and need not be repeated. *Silverton v. Brown,* 63 Or 418, 128 P 45, declares that the required possession must be such as "clearly indicates an exclusive appropriation and use of the land by the person claiming to hold it." *Bowman v. Bowman,* 35 Or 279, 57 P 546, and *Anderson v. Richards,* 100 Or 641, 198 P 570, de-

clared that, generally, possession must be of such character as to give the record owner some knowledge that possession is adverse. In *Reeves v. Porta,* 173 Or 147, 144 P2d 493, the claimant alleged occupancy of property adjoining the family farm. He dug some drainage ditches, rented the property to tenants, made feeble attempts at farming, grazed upon it a few cows and did "insubstantial" fencing. The decision found that those acts amounted to mere intermittent and disconnected acts of trespass. They did not constitute adverse possession. The plaintiff relies heavily upon that decision, believing that it is definitely parallel to the instant case.

We do not believe that the circumstances described in the Reeves decision and those in the case at bar are counterparts of each other. Their numerous differences are substantial and require no comment in this opinion. The decision of this court which adjudicated upon the occupancy of land somewhat similar to that now in issue is *McNear v. Guistin,* 50 Or 377, 92 P 1075. In that opinion, this court said that the acts upon which a claimant relies must have been so open, exclusive and continuous as to have left no doubt as to his intention and so notorious as to create a presumption that the owner knew of the possession. The decision added that the claimant's occupancy of the land must have been "so continuous as to have furnished a cause of action every day during the required period."

The evidence in this case leaves no room for doubt as to the intention of the Gerkings, for it shows that they constantly treated the land as their own, especially so after their lease with Frank Keeney had expired. The notoriety of their claim among the neighbors and the public officials who were concerned with this prop-

erty is equally well established. Their activities on the place after the conclusion of their lease were such as to create a strong inference that Frank Keeney knew that they were there and that they were claiming ownership of the place. In fact, the evidence discloses an incident which occurred in June of 1938 when Gerking and Frank Keeney were in the office of the county judge of Umatilla county. While there Keeney told the county judge that he no longer had any interest in the property. At the same time Gerking spoke of his occupancy and claim of ownership. From that day on knowledge of the Gerkings' claim of ownership must be charged to Frank Keeney. The plaintiff, as we have seen, knew nothing about this place until shortly before the suit was filed, but the knowledge of his father must be imputed to him. A personal visit to the place by the plaintiff while the Gerkings were in possession would surely have given the plaintiff an inkling that some one was claiming the property other than his deceased father or himself. That would have been true even if no member of the Gerking family had been upon the place on the day of the visit. Likewise, a visit to the place would have apprised the plaintiff of the occupancy even if the fences had been in poor repair or if the meadows bore no crop, for the cattle were upon the place and the farming equipment was in view.

*McNear v. Guistin,* supra, speaks of a need for continuity of physical activity upon the premises. The opinion in that case shows that the acts of possession upon which the claimant relied were so insubstantial that there never was any actual possession. The acts upon which the claimant relied were nothing more than occasional temporary entries upon the property for limited purposes. In the instant case, the evidence

establishes actual possession at the inception and continued possession in the manner for which the land was best suited for a period of years, although a decline occurred in quality of possession in the later years. There was at no time an abandonment of the premises sufficient to put the record owner back into constructive possession. *Ringstad v. Grannis,* 171 F2d 170, 1 Am Jur p 887, § 167, Adverse Possession. At all times during the required ten-year period it would have been necessary for Frank Keeney during his lifetime and, upon his death, for the plaintiff, to have ejected the Gerkings if either had wished to obtain possession. We find that the possession was sufficient to apprise men of ordinary prudence that Gerking was acting as the owner of the place in accordance with the nature, location and utility of the tract. *Linn County v. Rozelle,* 177 Or 24, 162 P2d 150; *Ambrose v. Huntington,* 34 Or 484, 56 P 513.

Most of the physical acts of occupancy took place at the west end of the property. However, the fencing extended virtually around the entire place, and the cattle grazed at will over the entire domain. The plaintiff attacks the sufficiency of the fences as an inclosure which would extend the area of possession into the eastern parts of the property. In *Reeves v. Porta,* supra, the court found that the fence erected by the claimant "was not such a substantial fence as would indicate that plaintiffs were taking possession of the property with the idea of claiming ownership thereof." In the present case, more than one witness testified that the Gerkings' fences corresponded favorably with the type that was commonly used in that part of the state. Regardless of whether the Gerkings' fences were maintained in first-class condition or whether they were sufficient to turn cattle, we are convinced

that they were adequate to indicate that the Gerkings possessed the whole tract. It is true that some of the fences were off the property lines, but anyone interested in making observations would have been apprised by the fences that the entire tract was enclosed. The nature of the territory, the local practices, the gates at either end and the no trespassing signs which were posted were sufficient indications of the enclosure. Use of the rocky, steep, wooded eastern end of the property in the only manner for which it was suited, that is, grazing, was, in the circumstances, a sufficient entry and occupancy. The plaintiff cites *Reeves v. Porta,* supra, *Keerins Bros. v. Mauney,* supra, and *Linn County v. Rozelle,* supra, for the proposition that, without color of title, an enclosure is necessary to define the extent of possession. Those cases, in our opinion, do not disclose the asserted requirement, but rather indicate that there must be a sufficient indication of possession and that fencing is, in many circumstances, the best indication. It is our belief that what the Gerkings did was a sufficient indication that they were in possession and were claiming ownership against the entire world.

■ Without further analysis, we express our belief that the evidence discloses adverse possession for the statutory period and that it resulted in title being drawn to the Gerkings, the vendors of the defendant-respondent Pilot Rock Lumber Company. Therefore, the plaintiff is without right or interest in this trial.

The decree of the circuit court is affirmed.