Argued and submitted March 5, 2015, reversed and remanded on appeal,
affirmed on cross-appeal September 8, 2016

MID-VALLEY RESOURCES, INC.,
an Oregon corporation,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

FOXGLOVE PROPERTIES, LLP,
a Minnesota limited liability company,
*Defendant-Appellant*
*Cross-Respondent,*

*and*

YAMHILL COUNTY,
a political subdivision,
*Defendant-Respondent.*

Yamhill County Circuit Court
CV110139; A154337

381 P3d 910

Carroll J. Tichenor, Judge.

Thomas Sondag argued the cause for appellant-cross-respondent. With him on the briefs was Lane Powell, PC.

Christopher P. Koback argued the cause for respondent-cross-appellant. With him on the briefs were E. Michael Connors and Hathaway Koback Connors LLP.

No appearance for respondent Yamhill County.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

**FLYNN, J.**

This appeal arises from an action under the Uniform Declaratory Judgments Act, ORS 28.010 to 28.160, to resolve a property dispute between neighboring land owners. Foxglove Properties, LLP, and Mid-Valley Resources, Inc., own adjoining parcels of land in rural Yamhill County. The trial court issued a limited and then a general judgment declaring that Foxglove's property is subject to both a 40-foot-wide public right-of-way and an adjacent 24-foot-wide private easement across which Mid-Valley can build a road. Foxglove appeals from both judgments, challenging the trial court's rulings on summary judgment that the original owner of both parcels dedicated a 40-foot-wide public roadway through Foxglove's property and that any private easement owned by Mid-Valley has not been extinguished by adverse possession. Mid-Valley cross-appeals from the general judgment, challenging the trial court's refusal to declare that the 24-foot-wide strip is part of the public right-of-way, rather than only a private easement. We conclude that the trial court erred in declaring that there is a public right-of-way across Foxglove's property, but correctly ruled that the 24-foot-wide roadway is not a public-right-of-way. We also conclude that genuine issues of material fact preclude summary judgment on the question of adverse possession. Accordingly, we reverse and remand the judgment on Foxglove's appeal and affirm on Mid-Valley's cross-appeal.

## I.   BACKGROUND

Mid-Valley owns the northern half, and Foxglove the southern half, of what was once a single parcel known as Breyman Orchards. The 1909 plat of Breyman Orchards divided the property into 83 numbered lots drawn with solid lines to show the lot boundaries, although Breyman Orchards was never developed as a subdivision, and the lots were never sold off individually. In addition to the solid lot lines, the plat is marked with dashed lines that run inside the perimeter of, and across, the plat. The dashed lines are drawn parallel to lot lines, in some places bracketing the lot lines with double dashed lines.

Based on "scaling," the distance between each dashed line and the adjacent, parallel lot line is approximately 20 feet, making the space between the double-dashed lines approximately 40 feet.[1] However, no wording on the 1909 plat specifies the meaning of the dashed lines or the distance between the dashed lines and the adjacent lot lines.

At the southern end of the plat—now the Foxglove property at issue in this case—lots 42 and 43, and lots 52 and 53, are drawn as divided by a meandering north-south border with a single dashed line running alongside of that border. The space between the meandering border and dashed line is the strip that Mid-Valley claims to be a 40-foot-wide public right-of-way across Foxglove's property ("the purported 40-foot road").

Illustration of area at issue.

---

[1] Foxglove submitted evidence that "[s]caling confirms" some variations, with the distance between dashed lines and the perimeter as narrow as 18 feet and the distance between some dashed line pairs as wide as 45 feet. For purposes of this appeal, we accept Mid-Valley's estimate of the distances as exactly 20 feet and 40 feet because we ultimately conclude that, even viewed in the light most favorable to Mid-Valley, Foxglove is entitled to prevail on its motion for summary judgment regarding the public right-of-way.

In 1936, the northern portion of the property was conveyed in a deed that also conveyed a "24-ft. roadway" running through the southern parcel ("the 24-foot easement"). In language that has significance to Mid-Valley's public dedication claim, the deed describes the easement as running "parallel to and 12 ft. from the easterly margin of that certain roadway laid out and designated on the map of Breyman Orchards as running between lots 42 & 43, 52 & 53."

The 24-foot easement and the purported 40-foot road running through those lots meet the southern boundary of the property at Breyman Orchards Road. Beginning in the late 1960's, a gravel road also ran from Breyman Orchards Road onto the property through the area at issue. The southern property was owned by the Timmons family at that time, and the gravel road connected Breyman Orchards Road to a rock quarry on the property. The quarry was initially operated by a tenant of the Timmons family and, after 1994, by son Craig Timmons. There is a gate at the entrance to the gravel road at the point where it meets Breyman Orchards Road.

Mid-Valley sought a declaration that the dashed lines crossing the 1909 plat of Breyman Orchards were intended to represent dedications of public rights-of-way for roads, including a 40-foot public right-of-way across Foxglove's property. It also sought a declaration that the 1936 deed created an additional 24-foot public right-of-way to widen the 40-foot public right-of-way across Foxglove's property or, in the alternative, that the 24-foot easement created by the 1936 deed remained enforceable. Foxglove responded by seeking a declaration that there are no public rights-of-way through its property and that Foxglove's predecessor extinguished through adverse possession any private easements across Foxglove's property. Both parties filed motions for summary judgment to resolve the dispute.

The trial court granted both summary judgment motions in part and denied both motions in part, concluding that the 1909 plat dedicated a 40-foot-wide public-right-of-way through Foxglove's property. The court reasoned in part that Foxglove should be judicially estopped from denying

that the 1909 plat created a public right-of-way claim in light of a position Foxglove took in a 2004 hearing. The court also declared that the 1936 deed created a private easement that has not been extinguished through adverse possession.

## II. ANALYSIS

Because the parties appeal from judgments that address cross-motions for summary judgment and have assigned error to the court's rulings on both motions, both rulings are subject to review. *Adair Homes, Inc. v. Dunn Carney,* 262 Or App 273, 276, 325 P3d 49, *rev den,* 355 Or 879 (2014). "We review the record for each motion in the light most favorable to the party opposing it to determine whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Id.* (citing ORCP 47 C and *Eden Gate, Inc. v. D&L Excavating & Trucking, Inc.,* 178 Or App 610, 622, 37 P3d 233 (2002)).

A. *Dedication for Public Roads*

Before we explain why we are not persuaded that the dashed lines on the 1909 plat represent the dedication of public streets, we briefly describe the doctrine of common law dedication[2] and then explain why we disagree with the suggestion that Foxglove should be judicially estopped from denying the existence of a public road through its property—an argument that would be dispositive of the dedication issue if correct.

"A 'dedication' is 'an appropriation of land by the owner for a public use.'" *Dayton v. Jordan,* 279 Or App 737, 746, 381 P3d 1031 (2016) (quoting *Security & Invest. Co. v. Oregon City,* 161 Or 421, 432, 90 P2d 467 (1939)); *see Black's Law Dictionary* 473 (9th ed 2009) (defining "dedication" as "the donation of land or creation of an easement for public use"). The doctrine of common law dedication "rests on a theory of equitable estoppel." *Fallon v. Humes,* 51 Or App 381,

---

[2] Oregon also provides a statutory process for dedicating a public street right-of-way. *See* ORS 92.175 (describing methods by which "[l]and for property dedicated for public purposes may be provided to the city or county having jurisdiction over the land"); *Fallon v. Humes,* 51 Or App 381, 386, 627 P2d 1 (1981) (dedication may be made by statute or common law). But Mid-Valley does not contend that Breyman made a statutory dedication.

386, 627 P2d 1 (1981). As the Supreme Court has explained, when

> "the public and individuals *** proceed as if in fact there had been a dedication and acquire rights which would be lost if the owner were allowed to reclaim the land, then the law would not permit him to assert that there was no intent to dedicate no matter what may have been his secret intent."

*Muzzy v. Wilson*, 259 Or 512, 519, 487 P2d 875 (1971) (quoting *Portland Ry., L. & P. Co. v. Oregon City*, 85 Or 574, 583-84, 166 P 932 (1917)); *see also McCoy v. Thompson*, 84 Or 141, 147, 164 P 589, 591 (1917) (explaining, "to reclaim land would be a violation of good faith to the public and to those who have acquired private property with the expectation of enjoying the use contemplated by the dedication").

A dedication may be express, "as when the intention to dedicate is expressly manifested by a deed or an explicit oral or written declaration of the owner, or some other explicit manifestation of his purpose to devote the land to public use." *Muzzy*, 259 Or at 518 (quoting *Harris v. St. Helens*, 72 Or 377, 386, 143 P 941 (1914)). But the intention to dedicate land for a public use may also be implied, as long as that intention is *"clearly and unequivocally manifested." Id.* (quoting *Harris*, 72 Or at 388) (emphasis in *Muzzy*).

Mid-Valley's public dedication argument turns on whether the 1909 plat implies an intention to dedicate public streets, but Mid-Valley also contends that Foxglove should be judicially estopped from denying that the plat dedicated public roads. We disagree with both propositions

1. *Judicial estoppel*

Judicial estoppel is a common law equitable principle by which a party may be barred from taking a position in one judicial proceeding that is inconsistent with a position the same party successfully asserted in a different judicial proceeding. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609-10, 892 P2d 683 (1995); *Caplener v. U. S. National Bank*, 317 Or 506, 520-21, 857 P2d 830 (1993); *Johnson v. Dave's Auto Center, Inc.*, 257 Or 34, 41 n 7, 476 P2d 190 (1970). The

doctrine "has a twofold purpose: to preserve the sanctity of the oath and to protect the integrity of the judicial system by preventing inconsistent results in separate proceedings." *White v. Goth,* 182 Or App 138, 141, 47 P3d 550 (2002).

As the Supreme Court has explained, judicial estoppel "has no single, uniform formulation in the several jurisdictions in which it has been recognized." *Hampton Tree Farms,* 320 Or at 609. In Oregon, the doctrine "depends on the existence of three predicates: (1) a benefit; (2) obtained in a different judicial proceeding; (3) by means of asserting a position inconsistent with a position asserted in a later judicial proceeding." *Hallberg v. City of Portland,* 230 Or App 355, 362, 215 P3d 866 (2009) (citing *Sugar and Sugar,* 212 Or App 465, 470, 157 P3d 1263 (2007)).[3]

The facts pertinent to the estoppel issue are undisputed. Before it acquired the property subject to the dispute in this case, Foxglove and a related entity, Domaine Serene Vineyards, owned other property located within the 1909 plat. In 2002, a neighbor, relying on the dashed lines in the Breyman Orchards plat, sought to build a road through Foxglove's property. Yamhill County took the position that the dashed lines represented the dedication of public rights-of-way, and issued a permit to Foxglove's neighbor to improve a section of the asserted public right-of-way. Upon learning of the county's position, Foxglove sought to vacate any public rights-of-way through its property.

In its application to vacate the roadway, Foxglove described the property to be vacated as "certain platted public roads in the Breyman Orchards subdivision[.]" During a hearing before the county, Foxglove's counsel explained that, although Foxglove did not concede that there was a public right-of-way through its property, it sought to vacate any public right-of-way that the county believed existed. The Yamhill County Commission approved the requested road vacation.

---

[3] We note that Oregon case law is mostly illustrative of when Oregon courts will *not* apply the doctrine of judicial estoppel. Although many cases have considered whether the doctrine was applicable, only a few have actually applied it. *See, e. g., Hallberg,* 230 Or App at 360-62; *Glover v. Bank of New York,* 208 Or App 545, 552-58, 147 P3d 336 (2006), *rev den,* 342 Or 416 (2007).

The premise of Mid-Valley's argument for judicial estoppel is that, by seeking to vacate public rights-of-way on its other Breyman Orchards property in 2004, Foxglove necessarily took the position that the 1909 plat identified and dedicated public rights-of-way, a position that would be inconsistent with Foxglove's argument in the present action. As noted, the doctrine of judicial estoppel prevents a party, in some circumstances, from taking inconsistent positions in different judicial proceedings. *Hampton Tree Farms*, 320 Or at 611. Assuming, without deciding, that the doctrine is applicable to positions taken in a county proceeding that both parties describe as "quasi-judicial," we conclude that the record does not establish that Foxglove's positions were inconsistent.

According to the facts that Mid-Valley describes as undisputed, in the 2004 proceeding, the county had already granted a right-of-way permit over one section of Foxglove's property, which prompted Foxglove to initiate the road vacation proceeding to prevent the county from issuing additional permits. In order to do that, Foxglove necessarily had to describe the rights-of-way to be vacated. But that did not amount to an affirmative assertion, or an admission, that the plat had, in fact, dedicated public rights-of-way. Rather, Foxglove's position in the earlier proceeding can be described as an alternative position—that assuming rights-of-way exist, they should be vacated. That position is not inconsistent with Foxglove's position in the present action that there are no public rights-of-way through the property. Thus, Foxglove is not estopped from challenging Mid-Valley's interpretation of the 1909 plat.

## 2. *The 40-foot-wide roadway*

Mid-Valley's claim of dedication, here, is based on a theory of implied dedication. It contends that the undisputed facts establish that Breyman impliedly dedicated public rights-of-way with the Breyman Orchards plat. The burden to establish an implied common law dedication is a heavy one, however, and Mid-Valley's evidence does not meet its burden.

To prevail on a claim of implied public dedication, the proponent must prove that the grantor intended "'to

devote his property to a *public* use, and *this intention must be clearly and unequivocally manifested by his acts.'"* *Muzzy*, 259 Or at 518 (quoting *Harris*, 72 Or at 388 (emphasis in *Muzzy*)). As the Supreme Court has explained, "[t]he security and certainty of the title to real estate are among the most important objects of the laws of any civilized community. * * * What a man once had he is not to be presumed to have parted with, but the fact must be shown beyond conjecture." *Security & Invest. Co.*, 161 Or at 433 (quoting *Lownsdale v. City of Portland*, 1 Or 381, 397, Fed Cas No 8578, 1 Deady 39 (1861)). For example, the Supreme Court held in *McCoy* that a plat showing a line drawn parallel to a lot line, with the space between the lines labeled "Street 40 feet wide bears North" implied a dedication because it "express[ed] in plain and unmistakable terms an intent to make a street of the 40-foot strip." 84 Or at 143, 149. "[W]hat ultimately matters is whether the plattor intended to make a dedication, and not merely whether the disputed property has been delineated on a plat." *Dayton*, 279 Or App at 748 (citing *Steel v. City of Portland*, 23 Or 176, 184-85, 31 P 479 (1892)).

In determining whether Breyman intended to create a dedication of roads for public use, the plat and documents of conveyance are to be interpreted "as any other writing would be," and "construed as a whole in order that the intention of the dedicator may be ascertained; and every part of the instrument given effect." *Security & Invest. Co.*, 161 Or at 430. "Our task is to discern and effectuate the intent of the grantor as evinced in the documents of conveyance and surrounding circumstances." *Coussens v. Stevens*, 200 Or App 165, 172, 113 P3d 952 (2005), *rev den*, 340 Or 18 (2006).

Here, as noted, the plat makes no express reference to streets or a dedication of streets, and the dashed-line strips are not labeled. The trial court, nevertheless, concluded that, in light of the design of the planned subdivision and the locations of the dashed lines through and connecting the lots, there was only one plausible explanation for the dashed lines: the laying out of a system of public streets for access to and between the lots. Foxglove contends that there are other plausible explanations, and we agree.

Foxglove argues that Breyman could have intended the dashed lines to suggest a variety of private uses *if* the lots were ever developed, including the location of future *easements* for *private* roads, alleys, or utilities. Those purposes are not equivalent to an intention to dedicate the land for public use. *See Muzzy*, 259 Or at 520 (circumstances of ownership and development of land subject to claim of public dedication "at most * * * suggest[ed] an intent that all of the owners of land in this area have the right to use this strip for access to their property. Such a use by private persons in connection with the use of their own property is not a public use").[4] Foxglove points out that, in prior Oregon cases, courts have interpreted dashed lines on a property map to have various meanings other than a dedicated public road. *See, e.g., Keeney v. Pilot Rock Lumber Co.*, 206 Or 156, 161, 291 P2d 735 (1955) (trails); *Menstell v. Johnson,* 125 Or 150, 163, 262 P 853 (1927), *modified on denial of reh'g,* 125 Or 150, 266 P 891 (1928) (building setback lines); *Pfaendler v. Bruce*, 195 Or App 561, 564, 98 P3d 1146 (2004) (private easements); *Bloomfield v. Weakland*, 193 Or App 784, 797-98, 92 P3d 749 (2004), *aff'd,* 339 Or 504, 123 P3d 275 (2005) (private walkways). On the plat here, the fact that the dashed lines are not labeled as roads, the fact that the strips created between the double dashed lines inside the parcel are twice as wide as the strips created around the perimeter, and the fact that only a single dashed line runs along the border between lots 42/43 and 52/53 all contribute to ambiguity.

---

[4] Mid-Valley argues that a discussion of scholarly opinions in *Oregon City v. Or & Cal. R. Co.,* 44 Or 165, 177-78, 74 P 924 (1904), suggests there is a presumption that dedications of land are for public, rather than private, benefit. That discussion, however, must be understood in the context of the court's emphasis that the map for the town of Oregon City made it "very apparent" that a strip of land, identified in the city records as "Bluff Street," "was designed and intended to be dedicated to the public as a street or public way." *Id.* at 176. Moreover, the principle that Mid-Valley ascribes to *Oregon City* would make that case inconsistent with the enduring line of authority specifying that a dedication for public use is *not* presumed. *See, e.g., Muzzy*, 259 Or at 521 (declining to "assume" from deed's reference to strip of land as an "alley" that the land was intended for public, rather than just private, use); *Security & Invest. Co.*, 161 Or at 433 ("In some jurisdictions where the intention to devote land to a public use is doubtful, such doubt is resolved against the donor, but such is not the rule in this state."); *Hogue v. City of Albina*, 20 Or 182, 187, 25 P 386 (1890) ("A dedication is not presumed, but must be shown by the acts and declarations of the owner of such a public and deliberate character as clearly show an intention on his part to surrender his land for the use of the public.").

Foxglove also points to undisputed evidence that the same surveyor who prepared the 1909 Breyman Orchards plat had, earlier the same year, prepared a subdivision plat for another land owner on which the surveyor used a different, and explicit, marking system to designate land between the private lots that the owners intended to dedicate as roadways for public use. Although, as Mid-Valley emphasizes, it is the intent of the dedicator—*i.e.*, not of the surveyor—that determines a dedication, *see McCoy*, 84 Or App at 148, the different labeling method employed by the same surveyor highlights the ambiguity inherent in the dashed-line markings on the Breyman Orchards plat. Rather than clearly marked strips of land, separated by solid lines from the land designated as private lots, the dashed lines on the Breyman Orchards plat run inside of the solid lot lines, raising doubt that the space between the dashed lines is intended to be public land. Thus, we disagree with the trial court's conclusion that the plat unambiguously expresses a dedication of public rights-of-way.

Mid-Valley asserts that the record on summary judgment, nonetheless, supports the trial court's rulings, because there is evidence that subsequent owners "acknowledged" the existence of a public road when transferring portions of the property. We do not share Mid-Valley's understanding that the language of subsequent deeds "acknowledged" a public dedication.[5]

Mid-Valley argues that a dedication is established by the 1936 deed with which Richardson conveyed the north portion of Breyman Orchards to the Namitzes, because that deed describes the location of the "24-ft. roadway" with reference to the location of "that certain roadway laid out and designated on the map of Breyman Orchards." This reference to a "roadway," however, does not clearly express the intent to dedicate a *public* roadway according to designations on

---

[5] For purposes of this opinion, we accept Mid-Valley's premise that deeds from subsequent owners can create a public dedication of roadways. *See Muzzy*, 259 Or at 521 (examining language in subsequent deeds for evidence of dedicatory intention after finding no evidence of that intention on the part of the original owner); *but see Miller v. Roy W. Heinrich & Co.*, 257 Or 155, 158, 476 P2d 183 (1970) (sale of lots with reference to a plat showing streets is conduct that can indicate a dedicatory intention *as to the streets indicated on the plat*).

the Breyman Orchards map, any more than the term was sufficient to make the "24-ft. roadway" a *public* dedication, as we will discuss below.

Mid-Valley also points to language that the Timmonses used in the 1969 and 1973 deeds, which referred to some of the land as "a platted area with certain dedicated but unopened roadways," and provided that Timmons "anticipate[d] vacating" the roadways and "therefore reserve[d] the right to vacate said roadways." But that language does not clearly express the intention to dedicate public roadways across the land. Indeed, the language in the 1969 and 1973 Timmons deeds clearly states that any roadways are not, and will not, be opened to the public.

We, therefore, conclude that the trial court erred in granting summary judgment to Mid-Valley on its claim that there is a dedicated 40-foot public roadway across Foxglove's property. In addition, because there is no evidence from which it can be determined that Breyman or any subsequent owners in the chain of title demonstrated a clear and unequivocal intention to dedicate public roadways, the trial court also erred in denying Foxglove's motion for summary judgment. *See* ORCP 47C (summary judgment).

3. *The 24-foot roadway*

Mid-Valley contends on cross-appeal that the trial court erred in declaring that there was never a dedication of a 24-foot public roadway across Foxglove's property.[6] We conclude that the trial court correctly granted summary judgment to Foxglove, and denied summary judgment to Mid-Valley, on this claim.

At the outset, we reject Mid-Valley's argument that the 1936 deed must be construed as creating a public dedication of the "24-ft. roadway," because it describes the roadway location with reference to "that certain roadway laid out and designated on the map of Breyman Orchards." According to Mid-Valley, the easement must have dedicated a public right-of-way because it was meant to run adjacent

---

[6] There is no contention that the 1936 deed conveyed to Namitzes fee title to the roadway. The possibilities presented by Mid-Valley were either a private easement or a public dedication.

to, and expand the width of, what Mid-Valley presumes was an existing public right-of-way on the Breyman Orchards map. Having rejected Mid-Valley's premise that the dashed lines on the Breyman Orchards map indicate a public right-of-way, we also reject Mid-Valley's conclusion that the easement must have dedicated an extra width of public roadway.

In addition, applying the standard for establishing a public dedication that we have described above, we conclude that the language of the conveyance in the Namitz deed cannot be construed as clearly and unequivocally establishing a public dedication. In fact, the deed conveyed the roadway to the Namitzes and "their heirs and assigns forever." That language is not a clear and unequivocal intention to dedicate a *public* right-of-way.

Moreover, we reject Mid-Valley's contention that reference to the 24-foot strip as a "roadway" in the conveyance expressed the unequivocal intention to dedicate a *public* roadway. Our cases demonstrate that private easements are commonly described as "roads" or "roadways." *Howe v. Greenleaf,* 260 Or App 692, 696, 320 P3d 641 (2014); *Watson v. Banducci,* 158 Or App 223, 226, 973 P2d 395 (1999); *Alger v. Smith,* 151 Or App 47, 54, 948 P2d 1244 (1997); *see Faulconer v. Williams,* 147 Or App 389, 391, 936 P2d 999 (1997), *aff'd,* 327 Or 381, 964 P2d 246 (1998). Thus, the use of the term "roadway" does not demonstrate a clear and unequivocal intention to dedicate a *public* roadway. The trial court correctly ruled on summary judgment that the 24-foot-wide easement described in the 1936 deed did not dedicate a public roadway.

B. *Adverse Possession*

Finally, we address Foxglove's contention—raised as both an affirmative defense and in its counterclaim for declaratory relief—that the 24-foot roadway easement and any private roadway created by the Breyman Orchards plat were extinguished through adverse possession. In response to the parties' cross-motions for summary judgment, the trial court ruled as a matter of law that Foxglove could not prove the elements of adverse possession. We conclude that there are genuine issues of material fact regarding whether Foxglove can prove adverse possession and, therefore, that

the trial court erred in granting summary judgment for Mid-Valley on the adverse possession defense but correctly denied Foxglove's cross-motion for summary judgment.

### 1. *Mid-Valley's motion for summary judgment*

The party seeking to establish adverse possession of an easement must demonstrate by clear and convincing evidence that the "use of the property was actual, open, notorious, exclusive, continuous, and hostile for a 10-year period, and that the use was inconsistent with the use of the easement by the owners of the dominant estate."[7] *Stonier v. Kronenberger,* 230 Or App 11, 18, 214 P3d 41 (2009) (citing *Faulconer,* 327 Or at 387, and *Thompson v. Scott,* 270 Or 542, 546-47, 528 P2d 509 (1974)).

We begin by considering Mid-Valley's motion for summary judgment, viewing the record in the light most favorable to Foxglove—the party opposing the motion. *Adair Homes, Inc.,* 262 Or App at 276. For purposes of its motion for summary judgment, Mid-Valley accepted that "there has historically been a gate across the gravel road that is located partially on the 40-foot roadway and partially on the 24-foot roadway," but contended that "the gate has not been closed consistently and has not been locked."[8] There is evidence, however, in the form of declarations and deposition testimony from the Timmonses and grandson Bradley, from which a reasonable factfinder could infer that the gate at Breyman Orchards Road was consistently closed and routinely locked from at least 1978 until 1994, when Craig took over the quarry operations and constructed a second gate closer to the quarry. There is also evidence that, before the

---

[7] In 1989, the legislature enacted ORS 105.620, which codified the common law of adverse possession and added a requirement that a party seeking to acquire fee simple title to real property by adverse possession must have had an "honest belief of actual ownership" when he or she first entered into possession of the property. Or Laws 1989, ch 1069, § 1. That statute, however, "does not apply to adverse possession claims whereby the owner of fee simple title to real property seeks to extinguish an easement on that property." *Uhl v. Krupsky,* 254 Or App 736, 745, 294 P3d 559 (2013).

[8] On appeal, Mid-Valley argues that "Foxglove never offered any proof that the mining company's road and gate was over the easement." However, to oppose the motion for summary judgment, Foxglove bore the burden to produce evidence only on issues "raised in the motion as to which the adverse party would have the burden of persuasion at trial." ORCP 47 C.

gate, there was a chain across the entrance to the road and that, as far back as 1980 the gate was posted with "no trespassing" and "private property" signs.

In Mid-Valley's brief on appeal, it primarily challenges Foxglove's ability to establish the duration of the allegedly adverse possession (that the identified adverse use did not continue for 10 years). For the period prior to 1994, Mid-Valley asserts that "[t]he undisputed evidence in the record demonstrates that it was the tenant mining company, not the Timmonses, who installed the chain and gate and kept it locked to protect its mining equipment," and argues that the act of a tenant cannot establish adverse possession. After that period, Mid-Valley points to evidence that the Timmonses regularly left the entrance gate open.

We, thus, focus on Mid-Valley's challenge to the element of "continuous" use and then briefly address each of the other elements of adverse possession. With respect to the element of "continuous" use, contrary to Mid-Valley's contention, it makes no difference that the access was blocked by the Timmonses' tenants as opposed to directly by the Timmonses. A tenant's adverse use of an easement "inures to the benefit of [the] landlord in establishing" adverse possession. *Feldman v. Knapp*, 196 Or 453, 474-75, 250 P2d 92 (1952) (adverse use of an easement by a tenant inures to the benefit of the landlord in establishing a right by prescription); *Harrell v. Tilley*, 201 Or App 464, 473, 119 P3d 251 (2005) (adverse use by tenant farmers evidences owner's open, notorious, and continuous use).

Moreover, evidence of different use after 1994 is irrelevant, because, once an easement is extinguished, it is gone forever unless it is recreated *de novo*. *Faulconer*, 327 Or at 395. Mid-Valley does not suggest that conduct after 1994 recreated an extinguished easement *de novo*. Thus, because there is evidence that the tenant mining company or the Timmonses maintained the gate across the easement from at least 1978 to 1994, the record permits a finding that the use of the gate to block entry to the easement was "continuous" for purposes of adverse possession.

The evidence permits a reasonable inference that the other elements of adverse possession are satisfied as well.

First, the evidence permits a finding that the Timmonses used the property in a manner that satisfies the elements of "actual" and "exclusive" use. Both elements focus on whether the use of the land is consistent with that of an owner of that land. *Slak v. Porter*, 128 Or App 274, 278-79, 875 P2d 515 (1994). Thus, we held in *Slak* that erecting a fence and planting vegetation directly in an easement established "actual" use because it is "the type of use that would be made by the owner of the property" and also that it established exclusivity because it was use "consistent with ownership." *Id.* The evidence of the Timmonses' use of the easement area, similarly, permits a finding that their use was "actual" and "exclusive."

The record also permits a finding that the use of the easement was "open" and "notorious." Use of land that is open and notorious for purposes of adverse possession need not openly declare an intention to block use of the easement; it is enough that the manner of use gives constructive notice that the person is asserting ownership. *Slak*, 128 Or App at 278-79. For example, we explained in *Slak* that the act of constructing a fence "is recognized as a 'classic' example of the type of use that satisfies the requirement of open and notorious use." *Id.* at 279 (quoting *Doan v. Bogart*, 254 Or 42, 43, 456 P2d 1001 (1969). On the record here, the acts of erecting a gate across the entrance to the easement and posting "no trespassing" signs permitted a finding that the Timmonses manifested the intention to control access to the easement, and that their use provided constructive notice that the Timmonses were asserting ownership over the area of the easement.

Finally, the record permits a finding that the element of "hostility" is met from the evidence that the Timmonses intended to completely control who could enter the roadway at the area of the easement. That evidence of intent establishes "hostility" whether the Timmonses knew the land was subject to an easement or mistakenly believed it was not. *See Faulconer*, 327 Or at 391 ("[I]f an adverse claimant occupies land that is subject to an easement under the mistaken belief that the easement lies elsewhere, and intends to possess that land as the owner and not in subordination

to the rights of others to use that land for roadway purposes, then the element of hostility is satisfied.").

Thus, the evidence in the record would permit a reasonable factfinder to determine that the 24-foot roadway easement, as well as any easement for an adjacent 40-foot private roadway, were extinguished by adverse possession. This means that the trial court erred in granting Mid-Valley's motion for summary judgment on the question of adverse possession.

2. *Foxglove's motion for summary judgment*

Although we have concluded that the record permits a factfinder to rule in favor of Foxglove on the issue of adverse possession, the record also permits a factfinder to rule against Foxglove. In reviewing Foxglove's motion for summary judgment on adverse possession, we must shift our perspective and view the evidence in the light most favorable to Mid-Valley, the party that opposed the motion. ORCP 47 C. Moreover, we must view the record in light of the rule that Mid-Valley bore no burden on summary judgment to produce evidence to controvert the elements of adverse possession because Mid-Valley does not bear the burden of persuasion on those elements at trial. *Id.*

Viewing the record through the lens required by ORCP 47 C, we are persuaded that genuine issues of material fact preclude Foxglove from prevailing as a matter of law on the issue of adverse possession. Specifically, the evidence does not compel a finding that the gate was placed at a location that blocked access to the easement or that it was consistently used in a manner that manifested an intention to prevent the easement holder from using the easement for roadway purposes. Thus, the record permits a reasonable factfinder to find that Foxglove has not proven by clear and convincing evidence that it extinguished the easement by adverse possession. *See Faulconer*, 327 Or at 391 (element of "hostility" is satisfied when occupier of land intends to possess the land "not in subordination to the rights of others to use that land for roadway purposes"); *Stonier*, 230 Or App at 18-19 (servient land owner did not prove by clear and convincing evidence that it extinguished easement by adverse

possession because there was evidence that easement holder was able to drive around house, garage, chicken coop, and fence that obstructed the easement). Thus, the trial court correctly denied Foxglove's motion for summary judgment on its affirmative defense and counterclaim of adverse possession.

## III. CONCLUSION

For the reasons detailed above, the trial court correctly declared that there is no public 24-foot roadway across Foxglove's property but erred in declaring that there is a 40-foot-wide public roadway across Foxglove's property. The trial court further erred in ruling that, as a matter of law, the easement or easements on Foxglove's property were not extinguished by adverse possession.

Reversed and remanded on appeal; affirmed on cross-appeal.